Daniel J. WALSH d/b/a Liberation
Graphics, Appellant,

v.

Nicholas F. BRADY, Secretary of
Treasury, et al.

No. 89–5429.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1990.

Decided March 15, 1991.

Kate Martin, Washington, D.C., for appellant.

Michael J. Singer, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty.

Gen., Jay B. Stephens, U.S.Atty., and Mark B. Stern, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before BUCKLEY, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinions filed by Circuit Judges BUCKLEY and STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Doing business as Liberation Graphics, Daniel J. Walsh imports political posters from around the world. In 1988 he wished to make a business trip to Cuba to arrange to import Cuban posters. Americans' transactions with Cuba and its nationals are regulated, however, by the Cuban Assets Control Regulations. 31 CFR Part 515 (1990).[1] These originated with the complete embargo on trade with Cuba proclaimed by President Kennedy nearly 30 years ago, see Proclamation No. 3447, 27 Fed.Reg. 1085 (1962), and are based on the Trading With the Enemy Act, itself enacted at our entry into World War I, see 40 Stat. 411 (1917). The regulations limit such transactions for many purposes, including both trade and travel, although subject to many exceptions. Walsh applied for a license to make payments for his travel. Despite a 1988 amendment barring the Act's use to prohibit or regulate the importation of informational materials such as posters, see 50 U.S.C.App. § 5(b)(4) (1988), the Secretary of the Treasury denied the application. Walsh challenged the travel payment restrictions in district court as violative of the 1988 statute and the Constitution. The court upheld the regulations as applied to Walsh, 729 F.Supp. 118 (D.D.C.1989), and we affirm.

I

■ The primary purpose of the disputed regulations is to stop the flow of hard currency from the United States to Cuba. See 47 Fed.Reg. 17,030 (1982) (tightening the regulations "to reduce Cuba's hard currency earnings from travel by U.S. persons to and within Cuba"). Although Congress in 1977 limited most uses of the Act to wartime situations, it grandfathered the authority for the Cuban trade embargo. International Emergency Economic Powers Act, Pub.L. No. 95–223, § 101(b), 91 Stat. 1625 (1977). Under the grandfather clause, the President may continue the exercise of these powers with respect to Cuba only if he annually certifies that doing so is in the national interest; successive presidents have so certified since 1978. See, e.g., 54 Fed.Reg. 37,089 (Sept. 7, 1989).

Until 1988 the regulations nominally allowed the importation of informational materials from Cuba but in reality banned it by requiring that the importers make payment into blocked U.S. accounts. See 31 CFR § 515.545 (1987). The 1988 amendment, however, sought to remove this ban:

> The authority granted to the President in this subsection [§ 5(b) of the Act] does not include the authority to regulate or prohibit, *directly or indirectly*, the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, *posters*, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials....

Pub.L. No. 100–418, § 2502(a), 102 Stat. 1107, 1371 (1988) (codified at 50 U.S.C.App. § 5(b)(4) (1988)) (emphasis added).

In response, the Secretary amended the regulations to permit "[a]ll financial and other transactions directly incident to the physical importation ... of informational materials." 54 Fed.Reg. 5234 (1989); see 31 CFR § 515.206 (1990). The Secretary agrees that the 1988 amendment allows an importer such as Walsh to pay for "the direct costs of importing posters into the United States, *e.g.*, expenditures for the posters' purchase, packing, insurance, and shipping." Letter from R. Richard New-

---

1. These are issued by the Secretary of the Treasury pursuant to authority delegated by the President. Exec. Order No. 9193, 3 CFR 1174, 1175 (1938–1943).

comb, Director, Office of Foreign Assets Control, Department of the Treasury to Kate Martin (Dec. 1, 1988).

The Secretary decided, however, that the 1988 Amendment did not require any changes to the regulations concerning payments for travel expenses. See 31 CFR § 515.206(e) (1990) ("This section does not authorize transactions related to travel to Cuba when such travel is not otherwise authorized under § 515.560 or by specific license."); see also *id.* § 515.560(a)(3) (denying authorization for transactions related to general business and tourist travel). According to the Director of the Treasury Department's Office of Foreign Assets Control, "Such travel was considered too tangential to the actual physical importation and exportation of informational materials to fall within the language of the [1988 amendment]." Newcomb Declaration ¶ 6.

Walsh states that he wishes to travel to Cuba "for the sole purpose of arranging for the importation of Cuban posters to the United States," and that "it is indispensable that I travel to Cuba in order to make the necessary agreements and technical, financial and transportation arrangements." He claims that before he can enter into a sensible major business contract, it is necessary for him to view not only the posters but also the production capabilities of Cuban poster makers and the quality of their paper, ink, colors, and printing techniques. He also wants to meet personally and to negotiate face-to-face with Cuban poster artists, publishers and exporters. He has made trips for similar purposes throughout Europe and to the Soviet Union, Lebanon, Nicaragua and Egypt. The district court found, for purposes of summary judgment, that "Walsh has established that travel to a foreign country is a normal and perhaps a necessary incident on occasion, as in the case of Cuba, to arrange for imports of political posters into the United States." 729 F.Supp. at 120.

Walsh argues that the regulations exceed the scope of the authority provided by the Act and burden his right of free speech in violation of the First Amendment. Be-

cause the regulations contain exceptions for activities such as newsgathering, he also claims a violation of the equal protection component of the Fifth Amendment's due process clause. See *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

II

First we must address Walsh's argument that the Secretary's interpretation of the 1988 amendment is not entitled to any deference under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). His theory is that deference is not due "when instead of delegating authority to an agency, a statute prohibits it from acting," Reply Brief for Appellant at 8, and he cites various cases in the ongoing debate over whether *Chevron* applies to "jurisdictional" provisions. Compare *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 380, 108 S.Ct. 2428, 2443, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring) (attacking the distinction between limits on authority and limits on application of authority) and *Dole v. United Steelworkers of America*, 494 U.S. 26, 110 S.Ct. 929, 944, 108 L.Ed.2d 23 (1990) (White, J., dissenting) (adopting Justice Scalia's analysis) with *Mississippi Power & Light*, 487 U.S. at 386–87, 108 S.Ct. at 2446–47 (Brennan, J., dissenting) (arguing against deference); see also *Business Roundtable v. SEC*, 905 F.2d 406, 408 (D.C.Cir.1990) (noting that the "Supreme Court cannot be said to have resolved the issue definitively"); *New York Shipping Ass'n v. Federal Maritime Comm'n*, 854 F.2d 1338, 1363 (D.C.Cir.1988) (alternative holding giving no deference).

■ Assuming that one can identify an intelligible class of cases that could be excluded from *Chevron* as "jurisdictional", we do not believe that the mere use of a negative brings a clause within that class. The appearance of a statutory negative is typically no more than an accident of draftsmanship or language. Compare *Continental Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund*, 916

F.2d 1154, 1159 (7th Cir.1990). If "automobiles" in ordinary parlance consist of passenger cars, light trucks, and vans, and Congress wants an agency to be able to reach the first two but not the third, it can either speak affirmatively of cars and light trucks, or it can use the generic term and exclude vans. The choice should make no difference in determining the scope of the agency's authority to draw a line between light trucks and vans.

The Supreme Court is clearly not bemused by congressional use of a negative. In *Chemical Manufacturers Ass'n v. NRDC*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), it construed § 301(*l*) of the Clean Water Act, an explicit restriction on the Environmental Protection Agency's power: "The [EPA] Administrator may *not* modify any requirement of this section as it applies to any specific pollutant which is on the toxic pollutant list under section 307(a)(1) of this Act." 91 Stat. 1566, 1590 (1977) (codified at 33 U.S.C. § 1311(*l*) (1988)) (emphasis added). In a conflict over the effect of the clause on the EPA's power to grant a specific type of variance from effluent limitations promulgated under § 301, the Court invoked *Chevron*, found that "modify" had no plain meaning in the context, and accepted the EPA's interpretation as permissible. See also *Mississippi Power & Light*, 487 U.S. at 380–81, 108 S.Ct. at 2443–44 (Scalia, J., concurring) (citing *Chemical Manufacturers* for the proposition that *Chevron* deference applies "to an agency's interpretation of a statute designed to confine its authority"); *Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir.) (giving *Chevron* deference to agency construction of a statutory exemption), *aff'd by an equally divided Court*, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989). We reject Walsh's theory that authority-restricting clauses are automatically governed by special interpretive rules. Accordingly, we apply the standard learning of *Chevron*, under which we defer to any reasonable interpretation of the statute unless Congress has "directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781.

Here both Walsh and the Secretary argue that Congress explicitly resolved the issue—but in opposite ways. We reject both claims. Walsh reads the 1988 amendment to extinguish any executive authority to use the Act to impose *any* regulation that "significantly burdens" trade in informational materials. Brief for Appellant at 11. He claims that by applying the travel payment restrictions to poster importers, "[t]he government has in essence read the word 'indirectly' out of the statute." *Id.* at 16.

We do not find Walsh's construction by any means compelled by the language or history of the amendment. The potential reach of his view is extraordinary. Suppose that the Cuban government required any American who wished to import informational items such as posters to pay for a trip to Cuba on a state-owned airline, to pay a substantial fee into government coffers, and to buy a large amount of (non-informational) Cuban goods. Each of these payments would then be a "normal and necessary" prerequisite to the importation of posters, and, although all of these transactions are now forbidden by the regulations, see 31 CFR § 515.201 (1990), Walsh's reading would require the United States to yield. The Secretary asserts that Walsh's position "would permit foreign countries such as Cuba to define the scope of the embargo." Brief for Appellees at 25. Competitive pressure from substitutes for Cuban posters would obviously limit the Cuban government's ability to do so, but we agree nonetheless that Walsh's view affords Cuba considerable power to sap the embargo.

The context and legislative history also prevent any conclusion that Congress clearly adopted Walsh's view. Before the amendment the regulations explicitly allowed the importation of informational materials, but undermined the permission indirectly—by requiring that payment be made into a blocked bank account in the United States in the name of the Cuban seller. See 31 CFR § 515.545(b) (1987). This suggests, as the government argues, that Congress may have intended the 1988 amend-

ment to shelter informational imports from executive power to regulate *import* transactions, but not from its power to regulate *travel* transactions linked to importation.

■ The government supports its contextual argument with an item of legislative history.[2] The House Committee on Foreign Affairs said of the amendment: "These provisions codify current practice under the International Emergency Economic Powers Act, as in the recent embargoes of trade with Nicaragua and Libya, of exempting information materials and publications from import restrictions." H.R. Rep. No. 40, 100th Cong., 1st Sess., pt. 3, at 113 (1987).[3] As the Secretary points out, although both the Nicaraguan and Libyan embargoes exempted various forms of informational materials, the restrictions on travel-related payments in those two embargoes have been entirely different. Although the Nicaraguan regulations have never restricted travel-related payments, see 31 CFR Part 540 (1987), those for Libya prohibit all transactions related to travel to and within Libya (except with special authorization), see 31 CFR § 550.207 (1987). The government argues that the citation to Libya must mean that Congress had a clear intent not to limit travel restrictions merely because of their incidental effect on informational imports.

■ In view of the broad sweep of the statutory language, and the absence of any evidence that the Committee had focused on the character of the Libyan regulations, we doubt if either context or the reference to the Nicaraguan and Libyan regulations can support a finding that Congress clearly intended to limit only restrictions on importation (as distinct from restrictions on travel). The context and legislative history are strong enough, however, to defeat Walsh's claim of a clear congressional decision to

strike down generic travel regulations that may in practice burden informational imports. They also, of course, suggest that the Secretary's reading of the amendment was reasonable.

When the Secretary responded to the passage of the 1988 amendment, he was faced with balancing two congressional concerns: (1) a desire expressed by the amendment itself to relax currency restrictions preventing the importation of informational materials from embargoed countries, and (2) a desire expressed by the remaining provisions of the Act to give the President wide powers to deny hard currency to embargoed countries. His construction plainly sought to balance these goals. Walsh, invoking the Administrative Procedure Act's ban on arbitrary or capricious actions, 5 U.S.C. § 706(2)(A) (1988), claims that certain hypothetical incongruities under the regulations demonstrate that they are unreasonable. While Walsh "theoretically may contract to purchase one million dollars worth of posters from Cuba or Cuban nationals, [he] cannot spend 300 dollars to travel to Cuba to choose the posters." Brief for Appellant at 25.

Of course a clever lawyer can imagine anomalous applications of any regulation. But the Secretary had to draw a line between expenses that are allowed under the informational materials exception and those that are not. One obvious difference—and one that suggests the stretch implicit in Walsh's hypothetical—is that there appears little risk that the exception for importation could be used as a cover for large-scale currency transactions only distantly connected to the 1988 amendment's purpose of enhancing the flow of informational materials. While the risk inherent in its extension to travel may not be vast, it appears greater than for pure im-

---

**2.** Walsh offers an item too, but it is oxymoronic "subsequent legislative history", here in the form of a letter from the amendment's sponsor to the Director of the Office of Foreign Assets Control. This can add nothing.

**3.** This committee report accompanied H.R. 3, a bill that was vetoed on May 24, 1988. See H.R. Doc. No. 200, 100th Cong., 1st Sess. (1988) (veto message). However, a few months later Con-

gress and the President agreed on a successor bill, H.R. 4848, which contained many of the provisions found in H.R. 3, including the one at issue in this case. H.R. 4848, which became Public Law No. 100–418, explicitly adopted the relevant legislative history of H.R. 3. See Pub.L. No. 100–418, § 2(a), 102 Stat. 1107, 1119 (1988).

portation, and while it could be addressed by numerical limits (e.g., X days or Y dollars per year for poster scouting), any such limits would raise line-drawing problems of their own. The travel-related payment ban certainly furthers the stated goals of the embargo program: (1) to deprive Cuba of hard currency, and (2) to make a political statement against the Cuban regime. See Newcomb Declaration ¶ 5. Given the history of the former requirement of blocked accounts and the absence from both statute and legislative history of even an oblique reference to the travel payment restrictions, we find the Secretary's accommodation of the conflicting policy goals entirely reasonable. See *Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783.

### III

Walsh claims that the application of the ban on travel-related payments to poster importers violates both the First Amendment and the equal protection component of Fifth Amendment's due process clause. We reject both theories.

### A

■ Walsh opens his First Amendment argument by claiming that the importation of posters is the "constitutional equivalent" of newsgathering. See Brief for Appellant at 29–30. He then argues that the ban on travel-related payments infringes his First Amendment right to import posters, and thus can be sustained only if supported by a "compelling state interest." *Id.* at 31.

*Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), squarely blocks Walsh's effort to subject the travel restrictions here to strict scrutiny under the First Amendment, since he does not allege that the restrictions have been imposed because of his exercise of First Amendment rights. Compare *Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). In *Zemel* the Supreme Court addressed a direct ban on travel to Cuba, implemented by the State Department's refusal to validate Zemel's passport for travel there. Zemel claimed that the ban was "a direct interference with the First Amendment rights of citizens to travel abroad so that they might acquaint themselves at first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies." 381 U.S. at 16, 85 S.Ct. at 1280. While recognizing that the ban would "render[ ] less than wholly free the flow of information" about Cuba, *id.*, the Court rejected the idea that this relationship elevated Zemel's travel right to First Amendment status. "There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.... The right to speak and publish does not carry with it the unrestrained right to gather information." *Id.* at 16–17, 85 S.Ct. at 1281. *Regan v. Wald*, 468 U.S. 222, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), though not addressing a First Amendment claim, upheld the very travel-payment restrictions here in question against a right-to-travel claim, noting that they were substantially identical to the absolute ban upheld in *Zemel*. *Id.* at 242, 104 S.Ct. at 3038.

Even an equation of poster importation with newsgathering would not mean "strict scrutiny" for the Secretary's regulation. The Supreme Court has repeatedly held that members of the news media enjoy no constitutional right of access to locations closed to the public. See, e.g., *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Pell v. Procunier*, 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974) ("newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public"); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974); see also *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972) ("It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."). If the First Amendment affords no special protection for Zemel's effort to examine political conditions in Cuba first-hand, it equally affords none for Walsh's effort to

serve as a proxy for citizens like Zemel by importing posters that may reveal conditions there.

Our First Amendment analysis does not end with a rejection of strict scrutiny, as *Zemel* did, because three years after *Zemel* the Supreme Court established standards for evaluation of government restrictions that are unrelated to the suppression of expression but that burden First Amendment freedoms incidentally. *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). The government concedes that the *O'Brien* test applies to the travel-payment restrictions, see Brief for Appellees at 29, presumably because Walsh convinced the district court that the regulations hamper his efforts to obtain posters from Cuba. See p. 1231 *supra*. In cases involving content-based restrictions, the Court has found the right to receive information and ideas from abroad to be a component of the First Amendment. See *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Kleindienst v. Mandel*, 408 U.S. 753, 762–65, 92 S.Ct. 2576, 2581–83, 33 L.Ed.2d 683 (1972).

Under the *O'Brien* test, as clarified by later decisions, content-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further "an important or substantial governmental interest." *O'Brien;* see also *Ward v. Rock Against Racism*, 491 U.S. 781, 797–98, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (rejecting "least-restrictive means" analysis under *O'Brien*). The Secretary argues that the travel-payment restrictions are aimed at denying hard currency to Cuba, rather than at suppressing the receipt of information from or about Cuba, and Walsh does not dispute this point. See *Teague v. Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir.1968). Walsh does, however, dispute the importance of the governmental interest served.

There is plenty of support for the Secretary's argument that the interest in denying hard currency to embargoed countries such as Cuba is "important" and "substantial". In *Wald*, the Supreme Court noted that the travel-payment restrictions at issue here "are justified by weighty concerns of foreign policy," 468 U.S. at 242, 104 S.Ct. at 3038, and the Second and Third circuits have found the interest in cutting off hard currency "vital" and "compelling", respectively. See *Teague*, 404 F.2d at 445; *Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs*, 459 F.2d 676, 682 (3d Cir.1972).

Walsh suggests that these earlier cases have been to a degree undermined by the adoption of the 1988 amendment itself. His theory is that by enlarging the class of hard-currency transactions permissible with Cuba, the amendment demonstrates the insufficiency of the governmental interest behind the ban. It is a startling notion that the government forfeits any claim that its foreign policy interests are important or compelling merely because it qualifies them in the interest of enhancing the free flow of information. Walsh's argument here really goes to the validity of the government's line-drawing, which is more appropriately addressed in the context of his equal protection claim.

B

The challenged regulations contain an exemption for newsgathering, providing a general license for travel-related payments for "persons who are traveling for the purpose of gathering news, making news or documentary films, engaging in professional research, or for similar activities". 31 CFR § 515.560(a)(1)(ii) (1990); see also *id.* § 515.560(c) (identifying transactions permissible for exempted travel). Walsh detects a violation of the equal protection clause in the government's failure to extend this exemption to importers of informational materials.

■ Walsh makes no claim either that the Secretary's distinction is message-related or content-based, or even that it is susceptible of functioning as a cloak for that sort of distinction. He argues instead that under *Austin v. Michigan Chamber of Commerce*, —— U.S. ——, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the distinction requires "strict scrutiny" simply because the

regulations "imping[e] upon" the right "to engage in political expression." 110 S.Ct. at 1401. Thus he invokes the "fundamental rights" line of equal protection jurisprudence, which requires "heightened" scrutiny for any distinction in a law that restricts fundamental rights (such as First Amendment freedoms). See *Austin,* 110 S.Ct. at 1401 (strict scrutiny for distinctions in a law that completely bans one class from speaking); *Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978) (intermediate scrutiny for distinctions in a law that burdens one group's fundamental right to marry, and denies the right for a narrower sub-group). We find the claim defective on two counts. First, we doubt that the relation to First Amendment freedoms is strong enough to trigger heightened scrutiny of either variant; second, even if it were, *Austin's* readiness to uphold favorable treatment of the news media indicates that the exemption for newsgathering would be valid even under the strictest test.

In support of its use of strict scrutiny, *Austin* invoked *Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972). *Mosley* in fact involved a ban on picketing in front of a school except for *labor picketing,* see *id.* at 92–93, 94 n. 2, 92 S.Ct. at 2288, 2289 n. 2, so the exemption was based on content. See also *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). In *Austin* itself, the *ban* was content-based, as the state had forbidden corporations' use of general treasury funds to support political candidates, but the disputed *distinction,* an exemption for media corporations, was not. Thus application of strict scrutiny in *Austin* appears an extension of *Mosley* and *Carey.* But this extension, if *Austin* really makes it, has its limits; though the Court in *Austin* spoke of strict scrutiny for distinctions in laws that "imping[e]" on political expression, 110 S.Ct. at 1401, in fact the Michigan law directly and explicitly banned speech. As a holding, therefore, it reaches only such laws.

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), might appear to support strict scrutiny for all content-neutral distinctions drawn in laws indirectly affecting speech, but it seems more likely addressed only to the special complexities of taxation. Justice O'Connor, writing for the Court, invalidated a "use tax" levied by Minnesota on ink and paper used for periodic publications (including newspapers). Although the Court relied on the First Amendment only, see *id.* at 585–86 n. 7, 103 S.Ct. at 1372 n. 7, its concern was with the state's distinctions —first, the exemption of the first $100,000 of purchases (thus favoring small papers), and second, the application of the tax exclusively to publishers. The state justified singling out the press on the ground that the ink-and-paper tax was *lighter* than the ordinary gross receipts tax, from which the press was altogether exempt. While the Court did not contest the factual claim, it refused to adopt the view that a special tax on the press could be upheld on the ground of net advantage. To support the refusal, it offered two theories. First, once the press is singled out, the government could achieve censorial goals by threatening more burdensome treatment of the press in the future; second, courts are poorly equipped to determine the net advantage in a welter of taxes. *Id.* at 588–90, 103 S.Ct. at 1373–74.

But the Court immediately undercut its first theory by indicating that a state could apply a lower *rate* of taxation to the press, as opposed to a different *method. Id.* at 590 n. 13, 103 S.Ct. at 1374 n. 13. Thus, *Minneapolis Star* seems to stand only for the proposition that states may not use a special scheme to tax the press, even where it gives the press an overall advantage over other taxpayers, because of the difficulties of assessing that defense. There is no call to read the decision as either generally forbidding, or even requiring strict scrutiny for, laws that single out the press for favorable treatment. Thus, neither *Austin* nor *Minneapolis Star* requires strict scrutiny of the newsgathering exemption here.

Nor does intermediate scrutiny appear required. While *Zablocki* imposed such a

burden for a classification that "significantly interferes with the exercise of a fundamental right," 434 U.S. at 388, 98 S.Ct. at 682 (requiring that such a classification be "supported by sufficiently important state interests and ... closely tailored to effectuate" them), the Court has understandably applied the trigger clause ("significantly interferes") very narrowly. In *Zablocki* itself the law barred marriage for a designated class (those unable to demonstrate that they were able to meet support obligations for prior children not in their custody), and the Court characterized the ban as "absolute[ ]". *Id.* at 387, 98 S.Ct. at 681. By contrast, in considering a law barring gender distinctions in some but not all private clubs, the Court recently rejected any heightened scrutiny because it found no evidence that the law "threaten[ed] to undermine the associational or expressive purposes of any club," even though it manifestly thwarted any single-gender associational purpose. *New York State Club Ass'n v. New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988); see also *Women Involved in Farm Economics v. United States Dep't of Agriculture*, 876 F.2d 994, 1004–05 (D.C.Cir. 1989) (only "rational basis" required for distinction that treated husband and wife irrebuttably as one "person" for purposes of $50,000 per person limit on farm subsidies, but that left other associations such as joint ventures free to show separateness); cf. *Community–Service Broadcasting v. FCC*, 593 F.2d 1102, 1122, 1124 (D.C.Cir.1978) (four of nine judges apply heightened scrutiny to content-neutral distinctions in taping requirements imposed on some broadcasters).

Here, there is no showing that the travel ban is a material burden on individuals' importation of posters for their own use. As to commercial poster importers, we do not read the district court as having found that travel to Cuba was essential for any such importation (see p. 1231 *supra* ), for clearly merchants over the long history of trade have often arranged for imports without inspection of the wares at the site of production. Even for importers insisting on such inspection, the ban is not absolute, as importers *may* travel to Cuba in search of posters if their travel expenses are paid by Cuban hosts or other non-U.S. persons. See 31 CFR § 515.560(j) (1990). Such an advance is by no means improbable, as Cuban poster manufacturers will have a serious incentive to make the investment, especially in view of Walsh's legal inability to pay his own way. Thus, unless we arbitrarily define the affected class as commercial poster importers who insist on on-site inspection and who are unable to secure Cuban or other non-U.S. support for poster reconnoitering in Cuba, the barrier is by no means absolute. (It would make no sense to so define the class, as doing so would in effect elevate the advantages of on-site inspection into essentials.) Accordingly, we doubt that the travel limits amount to "significant interference" with First Amendment rights, the threshold requirement for intermediate scrutiny.

In any event, even if some type of intermediate or even strict scrutiny were suitable for the Secretary's media exemption, *Austin's* validation of a media exemption against a "strict scrutiny" test means that the newsgathering exception here survives even the most stringent review. There, of course, the context was a virtual ban on corporate support of political candidates, with a content-neutral exemption for media corporations. The Court said that while "the press' unique societal role may not entitle the press to greater protection under the Constitution," it did provide a compelling reason for an exemption. 110 S.Ct. at 1402. The case may be read as manifesting a strong readiness to allow differentials favoring the press, as the distinction was unrelated to the ban's primary purpose, which was said to be preventing corporations from using " 'resources amassed in the economic marketplace' to obtain 'an unfair advantage in the political marketplace.' " *Id.* at 1397. The law left media corporations with vast "resources amassed in the economic marketplace" free to support candidates, while denying that right to puny non-media non-profit corporations regardless of their source of funds.

Here the Secretary was engaged in making a trade-off between the interest in denying hard currency to Cuba for foreign policy reasons, on the one hand, and that of permitting the flow of information, on the other. In the absence of travel by American reporters, news from Cuba could be "packaged" for transmission only by non-citizens, in whom American audiences might have less trust. Posters, by contrast, are valuable as pre-packaged political artifacts, so on-site review is less important. The Secretary found that the balance tilted in favor of the information goals as to news, in favor of the foreign policy goals as to posters. We think that trade-off every bit as sustainable as the one upheld in *Austin*. Compare *Federal Election Comm'n v. Political Contributions Data, Inc.*, 753 F.Supp. 1122 (S.D.N.Y.1990) (upholding a media exemption under heightened scrutiny, following *Austin*).

\*    \*    \*    \*    \*    \*

Because the Secretary's reading of the 1988 amendment to the Trading With the Enemy Act is reasonable, and because his distinction between newsgatherers and poster importers survives any applicable test, the decision of the district court is

*Affirmed.*

BUCKLEY, Circuit Judge, concurring:

I wish to disassociate myself from the sixth and seventh paragraphs of the court's equal protection discussion, part III.B of the majority opinion. As we conclude that the Secretary's media exemption "survives even the most stringent review" under *Austin v. Michigan Chamber of Commerce*, —— U.S. ——, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), Maj. Op. at 1237, it is not necessary for the disposition of this case to inquire into the applicability of intermediate scrutiny under *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). I join in all other aspects of the court's opinion.

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

Truth-in-judging obligations drive me to confess that I cannot make sense of requir-

ing strict or intermediate scrutiny for a distinction that is concededly content-neutral and free of any hint that it could have been intended to get at content indirectly, simply because the distinction is used to qualify a direct or indirect burden on free speech.

Suppose, for example, that in *Austin* the Michigan legislature had regarded corporate ability to support political candidates as very important, but outweighed (just barely) by concern over use of " 'resources amassed in the economic marketplace' to obtain 'an unfair advantage in the political marketplace.' " *Austin v. Michigan Chamber of Commerce*, —— U.S. ——, 110 S.Ct. 1391, 1397, 108 L.Ed.2d 652 (1990). Yet when it came to media corporations, it found the balance tilting (just barely) the other way. Assuming, as the Court concluded, that the tilt against non-media corporations was perfectly valid under the First Amendment, it is not clear why the law should fail merely because the *incremental* value of unimpeded speech by media corporations was slight—though just enough to make the legislature come out the other way.

If the requirement of a "compelling interest" addresses not the *differential* between forbidden and allowed speech, but the totality of interests favoring the exempt speech, the formula is equally puzzling. The state will *always* be able to invoke a constitutionally powerful interest in support of the exemption, to wit, free speech, as an exemption expands the sphere of permissible speech. As the speech interest is always there, it seems odd to set off on a big hunt for a "compelling" justification, which the court is sure to find. To speak of a need for "narrow tailoring" is equally puzzling: it surely cannot be the case that as a general matter the Constitution militates in favor of keeping content-neutral exemptions from free speech bans as narrow as possible.

The requirement of a compelling interest makes sense where there is something offensive about the character of the distinction itself, as is true of distinctions based on race, see, e.g., *Loving v. Virginia*, 388

U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), or on a speaker's message. And a demand for "narrow tailoring" sensibly seeks to assure that the burden imposed upon the burdened classes (in cases where there are unambiguously advantaged and disadvantaged classes as a result of the offensive legislative classification) is no heavier than the interest really justifies. Compare *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507–08, 109 S.Ct. 706, 728–29, 102 L.Ed.2d 854 (1989) (tailoring inadequate where distinction was advanced on grounds of remedying past discrimination, yet law accorded benefit even to entities that could be proven not to have suffered from discrimination in any relevant way). Some form of heightened scrutiny (though not necessarily compelling interest/narrow tailoring) also is appropriate where the ban is so narrow as to arouse suspicion either that the legislature could have been retaliating against a speaker's message, compare *News America Publishing, Inc. v. FCC*, 844 F.2d 800, 810–14 (D.C.Cir.1988) (applying intermediate scrutiny to burden on closed class of a single First Amendment actor), or attempting "to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected", *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112–13, 69 S.Ct. 463, 467, 93 L.Ed. 533 (1949) (Jackson, J., concurring); cf. *Kucharek v. Hanaway*, 902 F.2d 513, 520–21 (7th Cir.1990) (rejecting any special scrutiny for content-neutral exemptions from ban on obscene materials). These situations may not exhaust the field of cases requiring special judicial concern, but, unless the special instances become the rule rather than the exception, they can hardly explain heightened scrutiny across the board.

Where there is nothing at all suspicious about the legislative distinction, it would seem enough for courts to inquire simply into the rationality or reasonableness of the trade-off. We know we have strong interests on *both* sides of the balance (free speech on one side, and on the other whatever state interest enabled the restriction to survive First Amendment attack). Could reasonable legislators have found that there was marginally more need for the exempt speech, or that the interests favoring restriction were marginally less compelling? If so, and as always assuming the absence of any signs of legislative manipulation, neither First Amendment nor equal protection values seem to require more. Indeed, it would not be outlandish to read *Austin* as in substance finding no more than such a reasonable trade-off. See 110 S.Ct. at 1402; compare *id.* at 1414 (Scalia, J., dissenting); *id.* at 1425 (Kennedy, J., dissenting).

In any event, whatever the problems strict scrutiny may pose when applied to content-neutral distinctions in direct bans on speech, it surely poses more if extended to distinctions such as the present one—content-neutral distinctions (in effect, failures to restrict) in rules that are unrelated to the suppression of expression and that only incidentally affect First Amendment activity. Such an extension would mean strict scrutiny for all distinctions in any law subject to *O'Brien* analysis, an extraordinary expansion of judicial power.