FREEDOM TO TRAVEL CAMPAIGN;
Medea Benjamin; Pam Montanaro;
Walter Turner, Plaintiffs–Appellants,

and

Christopher Gerhart; Ginny Hildebrand;
James Hughes, Plaintiffs–Intervenors–
Appellants,

v.

R. Richard NEWCOMB, Director of the
U.S. Treasury Department's Office of
Foreign Assets Control; Ronald Noble,
Assistant Secretary of the Treasury for
Enforcement; Lloyd Bentsen, Secretary
of the Treasury, Defendants–Appellees.

No. 95–15291.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 1995.

Decided April 29, 1996.

---

Michael Krinsky, Rabinowitz, Boudin, Standard, Krisnky & Lieberman, New York City, for plaintiffs-appellants.

Mark B. Stern, United States Department of Justice, Washington, D.C., for defendants-appellees.

Before: HALL, KOZINSKI, and HAWKINS, Circuit Judges.

Opinion by Judge HALL; concurrence by Judge KOZINSKI.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Freedom to Travel Campaign ("FTC") and other appellants challenge the constitutionality of certain restrictions imposed on travel to Cuba by the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (1994). The district court denied FTC's motion for a preliminary injunction and granted the Treasury Department's motion for summary judgment upholding the regulations. The district court had jurisdiction to consider these claims under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I.

Plaintiff-appellant FTC organizes educational trips to Cuba. Intervenor-Appellants are three individuals wishing to visit Cuba with the Freedom to Travel Campaign.[1] FTC challenges the Cuban Asset Control

1. All appellants will hereinafter be referred to as "FTC."

Regulations which restrain its right to travel to Cuba. These regulations were promulgated shortly after President Kennedy announced the 1962 Cuban trade embargo that prohibited United States residents from engaging in certain enumerated economic transactions with Cuba without a license. *See* 31 C.F.R. Part 515 (1963).

The Regulations currently restrict travel to Cuba by banning nearly all economic transactions with Cuban nationals. 31 C.F.R. § 515.201(b) (1994). A small universe of persons can qualify for a general license partially exempting them from these restrictions. *Id.* at § 515.560(a) (covering journalists, government officials, and certain international organizations); *id.* at § 515.560(c) (allowing certain payments for transportation, lodging, and food). All other travelers, including tourists, must obtain a specific license from the Office of Foreign Assets Control. *Id.* at §§ 515.560(b), 515.801(b)(2). Regulation 560(b), as supplemented by Regulation 419,[2] provides that the Office of Foreign Assets Control "may" issue a license only upon a showing of "compelling need" to travel to Cuba for such specified reasons as "clearly defined educational ... activities." *Id.* at § 515.560(b); 60 Fed.Reg. at 54,196. Traveling to Cuba without a license is a criminal offense subject to imprisonment, fine, and property forfeiture. 31 C.F.R. § 515.701 (1994).

FTC wishes to travel to Cuba, but does not qualify for a general license under the Regulations. It has never applied for a specific license. Despite that, it has organized at least three trips to Cuba in which several hundred people took part and plans to conduct similar unlicensed trips in the future.

FTC originally moved for a preliminary injunction to enjoin the Treasury Department's ("Government's") enforcement of the Regulations. The Government cross-moved for summary judgment. The district court denied FTC's motion for a preliminary injunction and granted the Government summary judgment.

FTC presses four arguments on appeal: (1) that its claims are ripe despite its failure to apply for a specific license; (2) that Congress' delegation of authority to renew the Cuban embargo solely upon a determination that it is "in the national interest" is too broad; (3) that Regulation 560(b)'s license requirements for "educational" travel are facially vague under both the Fifth Amendment right to travel and the First Amendment; and (4) that the President's statutory authority conflicts with the United States' human rights treaty obligations. We affirm.

## II.

Questions of law underlying a denial of injunctive relief are reviewed de novo. *Miller v. California Pacific Medical Center,* 19 F.3d 449, 455 (9th Cir.1994) (en banc). Grants of summary judgment are also reviewed de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir. 1994).

## III.

The Government argues that we have no jurisdiction to hear FTC's claims because they are not ripe, since FTC never applied for and was therefore never denied a specific license under Regulation 560(b). If it had applied, the Government contends, it might have been granted a license and the suit would be dismissed. The district court agreed.

The ripeness of a claim is reviewed de novo. *Gemtel Corp. v. Community Redevelopment Agency,* 23 F.3d 1542, 1545 (9th Cir.1994). Whether a claim is ripe for adjudication depends on two factors: (1) whether the issue is fit for judicial decision and (2) whether the parties will suffer hardship if we decline to consider the issue. *American–Arab Anti–Discrimination Comm. v. Thornburgh,* 970 F.2d 501, 510 (9th Cir.1991). Legal questions that require little factual development are more likely to be ripe. *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409

---

2. The Treasury Department recently defined "educational activities" in Regulation 419, promulgated October 20, 1995. *See* 60 Fed.Reg. 54,194, 54,196 (1995) (to be codified at 31 C.F.R. § 515.419).

(1985). A threat of criminal penalty is considered hardship. *San Francisco County Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 821 (9th Cir.1987), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).

Under this standard, FTC's claims are ripe.[3] The issues we decide now—whether Congress has delegated too much authority to the President under Trading With the Enemy Act of 1917 ("TWEA"), whether Regulation 560(b) can withstand a facial challenge under the Fifth and First Amendments, and whether the Regulations contradict an international treaty—are pure questions of law that require no factual development. The criminal penalties available under the Regulations, *see* 31 C.F.R. § 515.701, subject FTC to sufficient hardship. We see no reason to wait for FTC's application to first be rejected by Office of Foreign Asset Control. *See Forsyth County v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 2402, 120 L.Ed.2d 101 (1992) (allowing facial First Amendment challenge to discretionary licensing scheme when plaintiff never applied for a permit); *Chicago v. Atchison, Topeka & Santa Fe Ry.,* 357 U.S. 77, 89, 78 S.Ct. 1063, 1070, 2 L.Ed.2d 1174 (1958) (allowing motor carrier to facially challenge Chicago's motor licensing scheme without first applying for a license).

Nor does *Reno v. Catholic Social Servs., Inc.,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), render FTC's claims unripe. In *CSS,* the Court held that only aliens who had applied for amnesty under the Immigration Reform and Control Act of 1986 could challenge the Act's provisions in federal court;[4] the claims of those who had not applied for amnesty were not ripe. *Id.* at 56–61, 113 S.Ct. at 2495–97. In reaching this holding, the Court drew a line in the sand between two types of administrative regulations. The first type, it observed, places the challenger in an "immediate dilemma": pay the cost to comply with the regulation, or suffer penal-

ties for failure to comply. *Id.* at 56–59, 113 S.Ct. at 2495–96; *see also American–Arab Anti–Discrimination Comm. v. Reno,* 70 F.3d 1045, 1060 (9th Cir.1995) (noting *CSS*' rule regarding "plac[ing] the applicant in the dilemma of paying a cost to comply or paying a penalty for noncompliance"). The second type of regulation imposes no *penalty* for noncompliance, but noncompliance nevertheless prevents the challenger from receiving a benefit. *CSS,* 509 U.S. at 58–59, 113 S.Ct. at 2496. In the Court's view, the dilemma present under the first type of regulation, in and of itself, rendered a challenger's claim ripe; a plaintiff attacking a benefit-conferring statute, however, would first have to apply for and be denied the benefit before having a ripe claim. *Id.* at 58–59, 113 S.Ct. at 2496. The Court concluded that IRCA's regulations conferred the benefit of amnesty, and that the plaintiffs' failure in that case to apply for amnesty was fatal to their action. *Id.* at 63–67, 113 S.Ct. at 2499–2500.

■ In a separate concurrence, Justice O'Connor parted company with the majority over its erection of a "categorical rule that would-be beneficiaries cannot challenge benefit-conferring regulations until they apply for benefits." *Id.* at 69, 113 S.Ct. at 2502 (O'Connor, J., concurring). She first observed that this rule flew in the face of Supreme Court precedent. *Id.* at 70, 113 S.Ct. at 2502 (citing *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956)). She further argued that the rule swept too broadly. While she acknowledged that a plaintiff challenging a benefit-conferring regulation would often be required to apply for and be denied the benefit before bringing

---

**3.** Not all of FTC's claims are ripe, however. *See supra* VI.A.

**4.** The Court also declared ripe the claims of aliens who had not technically "filed" applications for amnesty if their applications had been

summarily rejected by the INS subsequent to their tender but prior to their "filing" (under special INS regulations providing for this "front-desking" procedure). *Id.* at 60–63, 113 S.Ct. at 2497–98. The Cuban Asset Control Regulations have no procedure similar to this.

suit, she did not believe this would *always* be the case:

> If it is "inevitable" that the challenged rule will "operat[e]" to the plaintiff's disadvantage—if the court can make a firm prediction that the plaintiff will apply for the benefit, and that the agency will deny the application by virtue of the rule—then there may be a justiciable controversy that the court may find prudent to resolve.

*CSS,* 509 U.S. at 69, 113 S.Ct. at 2501–02 (O'Connor, J., concurring). Because the majority did not expressly disapprove of O'Connor's "firm prediction" rule, *see id.* at 58 n. 19, 113 S.Ct. at 2496 n. 19,[5] we are free to adopt it in this Circuit and do so now.

So construed, *CSS* does not bar FTC's claims. While we recognize that the Asset Control Regulations confer a benefit (permission to travel to Cuba) and that FTC has never applied for a license, we feel that we can firmly predict that FTC's application would be denied. Under the newly amended Regulation 419, only two activities qualify as "clearly defined educational activities": (1) attendance at a meeting or conference in Cuba and (2) activities related to undergraduate and graduate study in Cuba. 60 Fed. Reg. at 54,196.[6] FTC's educational travel plans include neither activity and would be therefore summarily rejected; its claims are ripe under *CSS.*

5. It instead stated that it could not, even under Justice O'Connor's rule, firmly predict that the plaintiffs' asylum applications in this case would have been denied. *CSS,* at 58 n. 19, 113 S.Ct. at 2496 n. 19.

6. In full, Regulation 419 reads:
(a) Section 515.560(b) provides, in part, that specific licenses will be issued to persons for travel to Cuba for clearly defined educational activities. Transactions related to travel and maintenance in Cuba for the following activities will be licensed upon submission of an adequate written application:
(1) Attendance at a meeting or conference held in Cuba by a person with an established interest in the subject of the meeting or conference, provided that:
(i) The meeting or conference is organized by an international institution or association that regularly sponsors meetings or conferences in other countries; and

Because we find that FTC's claims are properly before us, we now turn to the merits.

### IV.

■ FTC initially argues that the Cuban Asset Control Regulations are an impermissible delegation of Congressional power.

These Regulations, under which the President maintains the Cuban embargo, were promulgated pursuant to TWEA, 40 Stat. 411 (1917), *as amended,* 50 U.S.C.App. §§ 1–44 (1988). TWEA itself was a delegation of Congressional power to the President. When the Cuban Asset Control Regulations were originally enacted, TWEA provided that the President could restrict foreign trade and travel both in times of peace and war. 50 U.S.C.App. § 5(b) (1925). Thus, at that time, the Regulations were a proper exercise of the President's authority under TWEA. *See Regan v. Wald,* 468 U.S. 222, 225–26, 104 S.Ct. 3026, 3029–30, 82 L.Ed.2d 171 (1984).

In 1977, Congress amended TWEA and cut back the President's authority to impose embargoes except in times of war.[7] A new law was enacted to cover the President's emergency powers during times of peace. *See* International Emergency Economic Powers Act ("IEEPA"), Pub.L. No. 95–223, 91 Stat. 1626 (1977), *codified at* 50 U.S.C. §§ 1701–1706 (1988). It imposed a higher standard for the creation of peacetime embargoes; they were permitted only if neces-

(ii) The purpose of the meeting or conference is not promotion of tourism in Cuba or other commercial activities involving Cuba that are inconsistent with this part; and
(2) Activities related to study for an undergraduate or graduate degree sponsored by a college or university located in the United States;
(b) Transactions related to travel that is primarily tourist travel, including self-directed educational activities that are intended for personal enrichment, will not be licensed pursuant to § 515.560(b).
60 Fed.Reg. at 54,196.

7. Section 101(b) of Pub.L. No. 95–223, 91 Stat. 1625, amended § 5(b)(1) to strike "[d]uring the time of war or during any other period of national emergency declared by the President" and substituted in its place "[d]uring the time of war."

sary "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). The President also had to declare a national emergency. *Id.*

Congress, however, "grandfathered" in all then-existing economic embargoes. Instead of having to satisfy the more onerous IEEPA standards, the President could simply renew an embargo upon determining "that the exercise of such authorit[y] ... for another year is in the national interest of the United States." Pub.L. No. 95–233, § 101(b) (1977), *published at* 50 U.S.C.App. § 5 note (1988). In each year since the 1977 amendment, Presidents Carter, Reagan, Bush, and Clinton have determined that it was in "the national interest" to continue the Cuban embargo. *See, e.g.,* 59 Fed.Reg. 47,229 (1994) (President Clinton).

FTC argues that this "in the national interest" standard is too broad a delegation. FTC cites a number of cases in support of its argument. In *O'Neal v. United States,* 140 F.2d 908 (6th Cir.), *cert. denied,* 322 U.S. 729, 64 S.Ct. 945, 88 L.Ed. 1565 (1944), the Second War Powers Act of 1942 authorized the President to allocate materials and facilities when he found it "in the public interest" and necessary to "promote the national defense"; the Court found that although limiting the President's discretion to acting in the "public interest" was too broad, the dual standard was not. Similarly, in *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the Court upheld a delegation allowing the President to prohibit the sale of arms to those engaged in armed conflict in the Chaco[8] if he found it would contribute to the reestablishment of peace. In both cases, FTC argues, the President's power either required more of a national emergency or was limited in scope. Because, FTC concludes, the "national interest" standard is not similarly qualified, it is too broad.

The constitutionality of a statute is a question of law subject to our de novo review. *Gray v. First Winthrop Corp.,* 989 F.2d 1564, 1567 (9th Cir.1993). Article I, section 1 of the Constitution vests the legislative power of the federal government in Congress. U.S. Const., Art I, § 1. Over time, the government has reached a "practical understanding that ... Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989). Thus, delegations of Congressional authority are proper "[s]o long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id.* (citing *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)). This "intelligible principle" must not grant the delegate "unrestrained freedom of choice." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965).

Courts have interpreted this mandate liberally and, with two exceptions, have upheld every challenge to allegedly impermissible delegations. *Mistretta,* 488 U.S. at 373 & n. 7, 109 S.Ct. at 655 & n. 7. *See, e.g., National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (upholding delegation to FCC to make regulations "in the public interest"); *New York Central Securities Co. v. United States,* 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932) (upholding delegation to Interstate Commerce Commission to authorize mergers of railroad companies if it finds them "in the public interest"); *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (upholding delegation under Renegotiation Act to determine whether private parties earned "excessive profits" during wartime); *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (upholding delegation to Federal Power Commission to determine "just and reasonable" rates for utilities). *But see A.L.A. Schechter Poultry Corp. v.*

---

8. Chaco, a province of northeastern Argentina, was the site of a conflict between Paraguay and Bolivia.

*United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (striking down delegation to industry associations comprised of private individuals to create legally binding codes of "fair competition"); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (striking down delegation to President to criminalize the interstate transport of petroleum without limiting his power at all).

Delegation of foreign affairs authority is given even broader deference than in the domestic arena. It is well settled that "Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than it customarily wields in domestic areas." *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 1280, 14 L.Ed.2d 179 (1965). The level of deference is so much greater here that a delegation improper domestically may be valid in the foreign arena. *Curtiss–Wright,* 299 U.S. at 315, 57 S.Ct. at 218.[9]

*Zemel* clearly settles the issue before us. In *Zemel,* the plaintiffs challenged the delegation provisions of the Passport Act of 1926. This Act gave the Secretary of State the power to grant and issue passports, but set forth *no standards* to guide the use of his discretion. When the President invalidated all passports to Cuba in 1961, the plaintiff sued. The Court rejected his claim and found the delegation proper. *Id.* at 18, 85 S.Ct. at 1281.

Against this background, the correct result is easy to spot. To start, it is hard for us to see how the "public interest" standard upheld in *National Broadcasting* and *New York Securities* is any broader than the "in the national interest" standard contested here. Nor do we find it difficult to distinguish this case from the delegations struck down in *Schechter* or *Ryan,* since the Regulations were promulgated by government officials, *see* 50 U.S.C.App. § 1701 notes (1988), and since travel without a passport was criminal long before the Cuban Asset Control Regulations were created, *see Zemel,* 381 U.S. at 7–9, 31, 85 S.Ct. at 1275–77, 1288, C.F.R. § 515.701. When we consider that the Regulations deal with foreign relations, our decision becomes even clearer. The Supreme Court's approval of the strikingly broad delegation in *Zemel* makes our conclusion crystal clear: the delegation under which the Regulations are promulgated is valid.[10]

## V.

FTC argues in the alternative that the Regulations' travel ban is unconstitutional because the Government lacks a sufficient foreign policy rationale to inhibit FTC's liberty interest in travel. In substance, this appears to be a substantive due process claim and we will treat it as such.

The constitutionality of a statute is reviewed de novo. *Gray,* 989 F.2d at 1567. A substantive due process claim involves the balancing of a person's liberty interest against the relevant government interests. *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 279, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990).

FTC claims that its freedom to travel is trampled by the Regulations' travel ban. Although the freedom to travel international-

---

9. The *Curtiss–Wright* Court stated that the President has the power to refuse to disclose foreign affairs information to Congress if he determines it was "in the best interest" to do so. *Curtiss–Wright,* 299 U.S. at 321, 57 S.Ct. at 221.

10. On March 12, 1996, Congress enacted the Cuban Liberty and Democratic Solidarity (Liberated) Act of 1996, Pub.L. No. 104–114, 110 Stat. 785 (1996). In the Act, Congress refers to and reaffirms the Cuban Asset Control Regulations. *Id.* at § 102(c), 110 Stat. at 792 (to be codified at 22 U.S.C. § 6032) ("The President shall instruct the Secretary of the Treasury and the Attorney General to enforce fully the Cuban Asset Control Regulations set forth in Part 515 of title 31, Code of Federal Regulations."); *id.* at § 102(h), 110 Stat. at 794 (to be codified at 22 U.S.C. § 6032) ("The economic embargo of Cuba ... as in effect on March 1, 1996, including all restrictions under part 515 of title 31, Code of Federal Regulations, shall be in effect upon enactment of this Act, and shall remain in effect, subject to section 204 of this Act."); id. at § 204, 110 Stat. at 810 (to be codified at 22 U.S.C. § 6064) (allowing restrictions to be lifted when a "transition government" is in power in Cuba). We believe Congress' actions largely moot the Plaintiffs' claim that the Regulations are an impermissible delegation of Congressional power.

ly is a liberty interest recognized by the Fifth Amendment, *Kent v. Dulles*, 357 U.S. 116, 127, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958) ("Freedom to travel abroad is, indeed, an important aspect of the citizen's 'liberty.'"), it is clearly not accorded the same stature as the freedom to travel among the states. *Haig v. Agee*, 453 U.S. 280, 306, 101 S.Ct. 2766, 2781, 69 L.Ed.2d 640 (1981) ("The Court has made it plain that the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States."). Restrictions on international travel are usually granted much greater deference. *See Califano v. Aznavorian*, 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978) (upholding Social Security Act provisions against freedom to international travel challenge using only rational basis scrutiny). Given the lesser importance of this freedom to travel abroad, the Government need only advance a rational, or at most an important, reason for imposing the ban.

 This the Government can do. The purpose of the travel ban is the same now as it has been since the ban was imposed almost 35 years ago—to restrict the flow of hard currency into Cuba. That goal has been found "important," "substantial," and even "vital." *See Walsh v. Brady*, 927 F.2d 1229, 1235 (D.C.Cir.1991) (finding purpose "important" and "substantial"); *Teague v. Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir.1968), *cert. denied*, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969) (finding purpose "vital"). Thus, the Government seems to have satisfied its obligation.

FTC, however, would have us evaluate the foreign policy underlying the embargo. It contends that the President's current reason for the embargo—to pressure the Cuban government into making democratic reforms—is not as compelling a policy for an embargo as were previous justifications that relied on national security concerns. FTC thus invites us to invalidate the ban. This is an invitation we must decline.

 It is well-settled that "[m]atters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Regan*, 468 U.S. at 242, 104 S.Ct. at 3038 (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952)). This immunity manifests itself in a history of judicial deference. In both *Sardino v. Federal Reserve Bank*, 361 F.2d 106 (2d Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966), and *Regan*, 468 U.S. 222, 104 S.Ct. 3026, courts refused to entertain claims that the executive lacked an adequate foreign policy rationale for the Cuban embargo. *See Sardino*, 361 F.2d at 112 (refusing to entertain claim that Cuban foreign policy did not support asset freezing); *Regan*, 468 U.S. at 242, 104 S.Ct. at 3038 (refusing to hear claim that absence of Cuban Missile Crisis security risk left Cuban embargo without sufficient foreign policy justification).

Even were we to second guess the President, this is not a case where the Government has set forth no justifications at all. It has detailed numerous reasons for the embargo. We will look no further. The Cuban Asset Control Regulations' travel ban is constitutional.

### VI.

FTC next argues that even if the ban itself is constitutional, the Regulations' licensing exceptions are unconstitutionally vague under the Fifth and First Amendments. This is a particularly novel argument in that FTC challenges the *restoration* of rights that have been validly taken away. *See* Part V. We deal with each argument in turn.

### A.

 FTC claims that two provisions of Regulation 560(b) are void for vagueness and therefore infringe upon its freedom to travel.[11] As noted above, Regulation 560(b)

---

11. We recognize that the "void for vagueness" doctrine encompasses two distinct types of challenges outside of the First Amendment context— only one of which is relevant here. A statute

may be void for vagueness because it does not define the conduct it prohibits so that an ordinary person would not know what is required of him. *Grayned v. City of Rockford*, 408 U.S. 104,

provides that the Office of Foreign Asset Control "may" grant specific licenses for "clearly defined educational ... activities." 31 C.F.R. § 515.560(b). FTC claims that "clearly defined educational ... activities" are anything but clearly defined, and that this language therefore gives Asset Control officials broad discretion to deny licenses depending on what they decide to deem educational.[12] FTC further contends that by using the word "may" instead of "must" or "shall," the Regulation vests the Office with ultimate and unlimited discretion whether to issue a specific license. Since the denial of a license restricts its due process freedom to travel, it argues that these arbitrary standards render the Regulation void for vagueness under *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), and *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965).

■ FTC correctly states that due process will not tolerate a law restricting the freedom of movement if its enforcement is left to the whim of government officials. In *Kolender*, the Court sustained a facial challenge to a municipal ordinance that required persons who loitered to provide police with "credible and reliable" identification. The Court held that the statute provided no objectively verifiable definition of "credible and reliable" identification; it left the police with unfettered discretion to arbitrarily decide what was "credible and reliable" and therefore to decide whom to arrest. *Kolender*, 461 U.S. at 357, 103 S.Ct. at 1858.

The Court in *Shuttlesworth* struck down a statute that permitted police to arrest a loiterer for not obeying an officer's request to "move on." Had the statute contained any other objective criterion to limit their discretion, it would have been permitted; for example, if police officers were limited to ar-

resting loiterers who blocked sidewalks and then disobeyed a request to move, the statute would not have been be infirm. *Shuttlesworth*, 382 U.S. at 95, 86 S.Ct. at 215.

The vagrancy ordinance in *Papachristou* permitted police to arrest a person for being a "common thief," a term never defined in the ordinance. As it did in *Kolender* and *Shuttlesworth*, the Court found that the statute gave the police carte blanche authority to arrest whomever they wanted. *Papachristou*, 405 U.S. at 168–71, 92 S.Ct. at 846–48.

FTC is incorrect in its assertion that these cases dispositively show the Regulations to be unconstitutional. To begin with, we must view these cases through a less critical lens, since *Papachristou*, *Shuttlesworth*, and *Kolender* all dealt with the freedom of *interstate* movement—not *international* travel. As noted above, the former is accorded much greater weight than the latter. *Haig*, 453 U.S. at 306, 101 S.Ct. at 2781.

Keeping that in mind, the Regulations' initial failure to define "educational activities" is not fatally vague. Two different people can look at an applicant's itinerary and arrive at the same conclusion as to whether it involves educational activities; although some reasonable debate may ensue, due process recognizes that some exercise of discretion is inevitable. *Grayned*, 408 U.S. at 114, 92 S.Ct. at 2302 ("As always, enforcement requires the exercise of some degree of ... judgment."). In any event, it is far less open to debate whether an activity is educational than whether identification is "credible and reliable" or whether a person is a "common thief." Even undefined, this term is not unconstitutionally vague.

The Treasury Department's recent amendment to the Regulations further cures any vagueness defects. Newly created Regulation 419 now defines "clearly defined educational activities" as (1) those conducted at an international meeting or conference; and

108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Alternatively, a statute may be void for vagueness because it encourages "arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Because Regulations 201 and 560(b) plainly prohibit ordinary travel to Cuba without

a specific license, a person of even limited intelligence would know what is required of him. Thus, FTC makes only the second type of claim.

**12.** The recent promulgation of Regulation 419 largely undercuts FTC's argument.

(2) those related to undergraduate or graduate studies. 60 Fed.Reg. at 54,196. Thus, this aspect of Regulation 560(b) is constitutional.

■ The "may" language of Regulation 560(b) is admittedly more troublesome.[13] We will not address this claim, however, because it is not ripe. We were able to hear FTC's challenge to the "educational activities" language because we could evaluate its merit by examining the face of the statute and holding it up to the guiding light of precedent; we required no factual knowledge to do this. Now, FTC asks us to decide whether the "may" language gives Office of Foreign Asset Control officials too much discretion in denying licenses. This we simply cannot do without more facts. Since the Office has never denied a license on this basis, we have no idea how it will exercise its discretion or if it ever will. We simply do not know enough to evaluate this claim. *Western Mining Council v. Watt*, 643 F.2d 618, 627 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981) ("The mere possibility that [an official] may act in an arguably unconstitutional manner ... is insufficient to establish the 'real and substantial' controversy required to render a case justiciable under Article III."); *American–Arab Anti–Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 510 (9th Cir.1991) (need for factual development renders claim unripe).

### B.

■ FTC echoes its void for vagueness argument in the First Amendment context. It argues that the Regulations' vague language gives Asset Control officials the ability to arbitrarily interfere with its right to gather firsthand information about Cuba, which its members would use to participate in the public debate about the wisdom of the Cuban–American embargo.

■ When a person's right to travel internationally is conditioned on the surrender of his First Amendment expressive or associational rights, the First Amendment is clearly implicated. *See Kent*, 357 U.S. 116, 78 S.Ct. 1113, (reversing refusal to issue passport because plaintiff was a member of the Communist party); *Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (reversing refusal to issue passport because plaintiff belonged to a communist organization). However, where a person seeks only to gather information, no First Amendment rights are implicated. *Zemel*, 381 U.S. at 16, 85 S.Ct. at 1280. In *Zemel*, the Supreme Court held that a travel ban to Cuba posed only an inhibition of action (travelling)—not of speech. The Court noted that "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow." *Zemel*, 381 U.S. at 16–17, 85 S.Ct. at 1281. Since the right to speak does not carry with it an "unrestrained right to gather information," *id.* at 17, 85 S.Ct. at 1281, the Court rejected the exact argument FTC now makes. We will do the same here.

Because the First Amendment is not implicated, FTC cannot challenge the Regulations for vagueness on this ground.

### VII.

■ FTC concludes by arguing that the Regulations conflict with the International Covenant on Civil and Political Rights, 6 I.L.M. 368 (1967) and are therefore invalid. FTC points to Article 12, section 3, which requires travel restrictions to be "necessary to protect national security." Since the 1977 grandfather clause allows the Cuban ban in the absence of national security threats, FTC argues that a national security requirement must be read into the grandfather clause.

■ We interpret treaties de novo. *United States v. Washington*, 969 F.2d 752, 754 (9th Cir.1992), *cert. denied sub nom. Lummi Indian Tribe v. Washington*, 507 U.S. 1051, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993). While it is true that acts of Congress should not be construed to conflict with inter-

---

**13.** It is unclear whether the recent amendments also undercut this argument. While Regulation 419 states that "specific licenses *will be issued* to persons for travel to Cuba for clearly defined educational activities," Regulation 560(b) continues to use the conditional "may" language. For purposes of this discussion, we will assume that the Regulations are still conditional.

national treaty obligations, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 178 n. 35, 113 S.Ct. 2549, 2562 n. 35, 125 L.Ed.2d 128 (1993), we fail to see any conflict here.

The "national security" provision of Article 12, section 3 qualifies only sections 1 and 2 of Article 12. 6 I.L.M. at 176 ("The *above-mentioned rights* shall not be subject to any restrictions except those ... necessary to protect national security.") (emphasis added). Section 1 states that all persons within a nation shall have the right to move within that nation. Section 2 states that "everyone shall be free to leave any country, including his own."

Because the Regulations do not trigger either section 1 or 2, the section 3 "national security" requirement does not apply. The Regulations do not deal with interstate travel, so section 1 is irrelevant. Nor is Section 2 relevant: it only guarantees the right to leave the United States—it says nothing about the right to travel to a specific destination.

Thus, there is no conflict between the grandfather provision and the International Covenant.

For these reasons, the decision of the district court is AFFIRMED.

KOZINSKI, Circuit Judge, joining in part and concurring in the judgment in part:

I reach the same result as the majority, but am unable to join all of its opinion. Specifically, I can't sign on to much of the discussion about the validity of the Trading With the Enemy Act or the Cuban Assets Control Regulations because the issues aren't ripe for review. FTC did not apply for, and suffer denial of, a specific license under the regulations; under *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), it is therefore precluded from challenging the statute and regulations

on grounds other than the First Amendment.[1] I thus join the opinion only to the extent it holds that FTC's First Amendment claim is ripe for review, *see* maj. op. at 1434, and without merit, *see* maj. op. at 1441.

**I**

Plaintiffs in *CSS* were illegal aliens who might have been entitled to an adjustment of immigration status under the Immigration Reform and Control Act of 1986. *CSS* held that those plaintiffs who had not applied for and been denied such an adjustment were, by virtue of that fact, precluded from facially challenging two INS regulations governing their entitlement to the adjustment. *Id.* at 56–61, 113 S.Ct. at 2495–97.

The Court reasoned that "injunctive and declaratory judgment remedies ... are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless ... the effects of the administrative action challenged have been felt in a concrete way by the challenging parties." *Id.* at 57, 113 S.Ct. at 2495 (internal quotation marks omitted). The regulations in *CSS* didn't have such an effect, because

they impos[ed] no penalties for violating any newly imposed restriction, but limit[ed] access to a benefit created by the Reform Act but not automatically bestowed on eligible aliens.... In these circumstances, the promulgation of the challenged regulations did not itself give each ... class member a ripe claim; a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him.... Ordinarily, of course, that barrier would appear when the INS formally denied the

---

1. Because *CSS* was premised at least in part on "prudential" concerns, in addition to "Article III limitations on judicial power," *CSS*, 509 U.S. at 57 n. 18, 113 S.Ct. at 2495 n. 18, and because we want to strike down at the earliest opportunity laws that impermissibly chill speech, *CSS*'s requirement that a party apply for a government benefit before bringing a facial challenge to regu-

lations limiting access to it is unlikely to apply in the First Amendment context. *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2142–43, 100 L.Ed.2d 771 (1988); *cf. American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1062 (9th Cir.1995).

alien's [adjustment] application on the ground that the regulation rendered him ineligible for legalization.

*Id.* at 58–59, 113 S.Ct. at 2496–97 (footnotes omitted).[2]

As Justice O'Connor recognized in her separate opinion in *CSS:* "The benefit conferred by the Reform Act—an adjustment in status to lawful temporary resident alien ...— readily can be conceptualized as a 'license' or 'certificate' to remain in the United States, or a 'variance' from the immigration laws." *Id.* at ——, 113 S.Ct. at 2502. Professors Davis and Pierce have similarly observed that "[t]he reasoning in the majority opinion [in *CSS* ] seems sufficiently broad to preclude pre-application judicial review of any rule that purports to describe criteria for obtaining any form of government benefit, e.g., ... any license, or exemption from any regulatory obligation." 2 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 15.14, at 383 (3d ed. 1994). This is because people who are entitled to apply for a license don't face a Hobson's choice of foregoing the regulated activity or suffering the penalties for undertaking it; they have third option, namely applying for a license. Licensing regulations are therefore better understood, not as "impos[ing] ... penalties for violating a[ ] newly imposed restriction, but [as] limit[ing] access to a benefit ... not automatically bestowed on eligible" entities. *CSS,* 509 U.S. at 58, 113 S.Ct. at 2496. Outside the First Amendment context, therefore, a facial challenge to an administrative licensing scheme isn't ripe unless the challenger has applied for and been denied a license.

Three of FTC's non-First Amendment claims are directed at the facial validity of the Cuban Assets Control Regulations. These are FTC's claims that the regulations violate the Fifth Amendment (under substantive due process and void-for-vagueness prin-

ciples) and the International Covenant on Civil and Political Rights. *See* maj. op. at 1438–41; 1441–42. These claims are analogous to claims held non-justiciable in *CSS;* plaintiffs there alleged the INS regulations violated the Fifth Amendment (under equal protection principles) and the Reform Act. 509 U.S. at 50–51, 113 S.Ct. at 2492.

FTC's final non-First Amendment claim is directed at the section of TWEA that authorizes the President to promulgate the regulations. The argument here is that TWEA unconstitutionally delegates legislative power to the President. *See* maj. op. at 1436–42. This claim too is non-justiciable under *CSS* because the mere enactment of a statute authorizing licensing regulations no more gives rise to a justiciable controversy than the mere promulgation of the regulations themselves: Not until plaintiffs are denied a license under the authority of the regulations do they have a sufficiently "concrete" interest in the constitutionality of the statute authorizing the regulations to give rise to a "ripe" claim. *See CSS,* at 56–57, 113 S.Ct. at 2495.

## II

My colleagues accept the teachings of *CSS* but find an exception for cases where " 'the court can make a firm prediction that the plaintiff will apply for the benefit, and that the agency will deny the application by virtue of the rule.' " Maj. op. at 1436 (quoting *CSS,* at 69, 113 S.Ct. at 2501–02 (O'Connor, J., concurring in the judgment)). This exception is inconsistent with fundamental principles of ripeness and doesn't help FTC in any event.

The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect

---

**2.** *CSS* further held that ripeness principles did not bar claims by those plaintiffs who had attempted to file an adjustment application at an INS office, but whose applications were turned away at the front desk on the ground that they

would necessarily be denied under the challenged regulations. *Id.* at 60–67, 113 S.Ct. at 2497–2500. FTC does not claim to have suffered such an informal rejection of a license application.

the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The majority's "firm prediction" exception undermines this rationale. To apply the exception, judges must determine in the first instance whether the agency would, in fact, have denied a plaintiff's benefit application. And they must do so without the help of an administrative record or the agency's thinking as to how the regulation applies in the circumstances. It's no answer to say the exception applies only in clear cases, because the courts will have to separate the clear from the less clear, raising precisely the concerns the ripeness doctrine seeks to avoid. The better rule is for courts to wait "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.*

*CSS* illustrates the problem. The majority there couldn't firmly predict that the plaintiffs would apply for the benefit of adjustment. *CSS*, 509 U.S. at 58 n. 19, 113 S.Ct. at 2496 n. 19. They were suing, in part, to get an extension of the statutory application period, *id.* at 50–54, 113 S.Ct. at 2492–93, relief they needed precisely because they'd failed to file timely applications to start with, *id.* at 58 n. 19, 113 S.Ct. at 2496 n. 19. Nor could the majority firmly predict that the INS would deny their applications based on either of the challenged rules; the Reform Act conditioned the benefit of adjustment on satisfying other rules as well. *Id.*

Just so here. While the majority dismisses out-of-hand the possibility that the Secretary might grant FTC a license, maj. op. at 1435–36, I see room for optimism. FTC attached to its Complaint the itinerary for its June 1994 trip to Cuba. *See* ER 19 (Compl. Exh. A); *see also* ER 151–69, 175–76, 180–81, 184–86 (Decl. of Pam Montanaro, an FTC coordinator, describing FTC's past and planned trips to Cuba and attaching itineraries for three past trips). According to this itinerary, FTC offered its travelers a program including "Meeting with the Minister of Foreign Relations, Roberto Robaina," "Cultural exchange between U.S. and Cuban musicians" and "Federation of Cuban Women: discussion of critical issues for women and the current situation in Cuba." ER 19 (Compl.Exh. A). The regulations authorize the issuance of a license for certain international organizations conducting educational "meeting[s] and conference[s]." 60 Fed.Reg. 54,194, 54,196 (1995) (to be codified at 31 C.F.R. § 515.419). It's no stretch to think the activities outlined in FTC's itinerary could qualify under this regulation. It seems doubtful, moreover, that their purpose is the impermissible one of "promoti[ng] ... tourism in Cuba." *Id.*

It's true that a meeting or conference doesn't qualify under the regulations unless it's "organized by an international institution or association that regularly sponsors meetings or conferences in other countries." *Id.* But FTC alleges that it's an "association," ER 2 (Compl. ¶ 2), and that it "intends to organize ... a series of additional trips to Cuba identical or comparable ... to its June 1994 trip," *id.* at 5 (Compl. ¶ 16). It's also true that the regulations authorize travel to attend a meeting or conference only by "person[s] with an established interest in the subject of the meeting or conference." 60 Fed.Reg. at 54,196. But FTC has put in affidavits from would-be travellers, including a participant in an organization that advocates ending the Cuban embargo, ER 47 (Hughes Decl. ¶ 3); *see also* ER 34 (Gerhart Decl. ¶ 3), 42 (Horvath Decl. ¶¶ 3–4), and a self-styled "feminist musician" who claims an interest in "the role of women in society and music in the political process," ER 38 (Hildebrand Decl. ¶¶ 2, 4).

To be sure, FTC offers travelers other activities that, in isolation, seem less likely to qualify for a license—a "Guided visit through the Museum of the Revolution" for example. ER 19 (Compl.Exh. A). But it's not uncommon for people attending educational conferences to also partake of some cultural activities and sight-seeing. The Secretary could easily interpret the regulations as focusing on the travel plan's dominant theme and,

without the benefit of an administrative record, we can only speculate about how such an interpretation might apply here.

Nor do I see the basis for concluding that FTC is more likely than the *CSS* plaintiffs to apply for a license in the future. The Supreme Court implicitly rejected the view that the *CSS* plaintiffs would apply for adjustment once they learned they couldn't facially challenge the INS regulations without doing so. Their previous failure to file timely adjustment applications raised doubts about whether they would apply in the future. Here, FTC has unjustifiably flouted the regulations since 1993, organizing at least three trips to Cuba without a license. ER 151 (Montanaro Decl. ¶ 15); Appellants' Br. at 3. Now, as before, FTC is free to file a license application and start a lawsuit if its application is denied. However, I can't "firmly predict" it will do so.

It doesn't matter, of course, whether my colleagues turn out to be right in their prediction. The point is that they're making it without any input by the administrative agency, not even so much as a history of how the agency has applied the regulations in other situations. Under such circumstances, "firm predictions" about what would happen if plaintiffs were required to pursue their administrative remedies are highly unreliable.

I would thus affirm the district court without reaching the merits of any of FTC's non-First Amendment claims.

