# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 16, 2008       Decided November 4, 2008

No. 07-5317

EMERGENCY COALITION TO DEFEND EDUCATIONAL TRAVEL,
ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF THE TREASURY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 06cv01215)

---

*Robert L. Muse* argued the cause and filed the briefs for appellants.

*Douglas N. Letter*, Litigation Counsel, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Gregory G. Katsas*, Acting Assistant Attorney General. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Concurring opinions filed by *Senior Circuit Judges* EDWARDS and SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Appellants include an association of academics–the Emergency Coalition to Defend Educational Travel (the "Coalition")–two college professors, and three undergraduate students. They sued the Secretary of Treasury and the Office of Foreign Assets Control within Treasury (the "Office") asserting that the 2004 amendments to the Office's regulations governing the Cuba trade embargo, which tightened restrictions on Cuba-based study programs, violated the First and Fifth Amendments of the Constitution, as well as the APA. The district court, in a thoughtful opinion, granted the Government's motions to dismiss. We affirm.

I

In 1963, President Kennedy exercised his broad authority under the Trading with the Enemy Act, 50 U.S.C. App. § 5(b) (the "Act"), to impose a comprehensive trade embargo against Cuba. Pursuant to a presidential designation under the Act, Treasury is the agency responsible for administering the embargo regime, and Treasury has in turn delegated the promulgation and implementation of the regulations thereunder to the Office. Cuban Assets Control Regulations, 31 C.F.R. Part 515. While the regulations were initially issued in order to combat subversive activities undertaken by the Castro regime throughout Latin America, over the years, their scope and stringency have waxed and waned in response to the shifting foreign policies of succeeding presidential administrations. The essential objective of the embargo, however, has remained the

same: to isolate the Cuban government by depriving the island's economy of the benefit of U.S. dollars.

Under the present regulations, the Office authorizes travel to Cuba via the issuance of either a general or a specific license. A general license is made available for travel related to official government business and, in certain defined circumstances, for journalistic or professional research activities. Specific licenses are dispensed on a "case-by-case basis" for all other purposes, including, *inter alia*, travel connected with familial obligations, religious activities, humanitarian projects, and cultural performances or exhibitions. Under the regulations, accredited U.S. undergraduate or graduate degree-granting academic institutions are eligible to obtain a specific license so as to allow qualified individuals to engage in an enumerated list of activities, including "participation in a structured educational program in Cuba." This limited exemption for selected educational activities has been in effect since 1999.

At immediate issue in this suit are certain 2004 amendments to the Cuba travel restrictions that resulted in a diminution of this exemption. These amendments were inspired by the recommendations of the interagency Commission for Assistance to a Free Cuba, established in 2003 by President George W. Bush. Secretary of State Colin Powell chaired the Commission, which was composed of high-level representatives from a variety of executive agencies, including the Secretaries of Treasury, Housing and Urban Development, Commerce, and Homeland Security, as well as the President's National Security Advisor. President Bush directed the Commission to report to him on how the U.S. Government might best induce the peaceful fall of the Castro dictatorship. Among the stated objectives of the Commission was to strengthen enforcement of travel restrictions in response to a perception that travel licenses had

been abused as a covert means to undertake illegal business or tourist travel.

In May 2004, the Commission submitted its Report.[1]  The Commission noted that the Castro regime has aggressively promoted tourism as an integral part of its strategy for retaining its grip on power.  The Commission observed that while some participants had used the specific licenses in accordance with their intended academic objective, less scrupulous travelers and universities had circumvented the embargo by using the licenses for improper tourist purposes.  And the Report was particularly dubious of certain study-abroad programs of short duration that allowed for minimal cross-cultural interaction with Cuban citizens and provided for excessive unstructured time during which participants might pursue purely tourist activities.  Concern was expressed that such programs were often cynically manipulated by the Cuban regime to coat the repressive Communist state with a patina of reasonability, openness, and legitimacy.  The Report concluded that a requirement that specific licenses for educational activities be granted solely to semester-length (*i.e.*, ten weeks or more) programs would retain the benefits of promoting the study of Cuba and of diffusing American values throughout the island nation while curtailing abuses.

The 2004 amendments to the regulations resulted.  First, a durational requirement for educational programs conducted in Cuba by U.S. academic institutions was added to the travel restrictions whereby any such program must last for at least one full academic term of no fewer than ten weeks.  Second, the

---

[1] Commission for Assistance to a Free Cuba, *Report to the President* (2004).

amendments require that any student traveling to Cuba under the specific license of an academic institution must be enrolled in either an undergraduate or graduate degree program at such institution–*i.e*., cross-registration in a course offered by another university would no longer be permitted. Finally, the amended regulations plainly state that any faculty teaching under the auspices of an academic institution's license must be "full-time permanent employees" "regularly employed in a teaching capacity at the licensed institution." The Coalition claims that this final requirement is new as of the 2004 amendments; the Government disputes this and asserts that the amendments merely clarified requirements contained in the existing regulations.

The Coalition is an organization of over four hundred academic professionals employed by accredited U.S. colleges and universities, both state and private. The group was formed in response to the 2004 amendments, and its sole purpose is to seek rescission of the amendments, or, in the Coalition's more colorful language, "to defend the freedom of U.S. professors and students to design, teach, and attend courses in Cuba free of U.S. Government *diktat*."

Appellant Dr. Wayne S. Smith, Ph.D., is the Chairman of the Coalition and an Adjunct Professor of Latin American Studies at Johns Hopkins University. He also serves as Director of Johns Hopkins' Cuba Exchange Program, and between 1997 and 2004, Smith taught annual inter-session courses to American students enrolled in the program. He asserts that the 2004 amendments not only resulted in the cancellation of the exchange program but also bar him personally from teaching in Cuba due to his status as an adjunct professor. Appellant Dr. John Walton Cotman, Ph.D., is an Associate Professor of Political Science at Howard University and specializes in the

study of international relations and comparative politics in the Caribbean region. Cotman claims that the 2004 amendments prohibit him from teaching courses offered in Cuba by other universities. Appellant Abby Wakefield was a Johns Hopkins sophomore when this suit was filed. She has been informed by Smith, speaking in his capacity as head of the Cuban Exchange Program, that the university's inter-session courses will resume immediately should the challenged rulemaking be rescinded and that she will be accepted into the first such program.

Appellants argue that the 2004 amendments caused the cancellation of virtually all of the courses offered in Cuba by U.S. universities. They claim that the ban on the prior practice of aggregating students from a variety of universities into one course offered by a single institution has made it economically infeasible for most universities to continue to offer courses in Cuba, given the limited resources available and the relatively small number of students interested in Cuba study at any one university. It is also asserted that the requirement that teachers of Cuba courses be "full-time permanent employees" "regularly employed in a teaching capacity at the licensed institution" has drastically reduced the pool of professors eligible to teach such courses. For example, this restriction, appellants argue, has precluded Smith (*qua* adjunct professor) and Cotman (*qua* guest professor) from teaching in Cuba. Finally, appellants argue that the minimum duration requirement prevents most interested students from studying in Cuba, since the standard graduation schedule cannot accommodate a ten-week semester devoted solely to the pursuit of one course.

The Coalition brought a mix of constitutional and statutory claims in the district court. They claimed that the amendments' "savage" restrictions on U.S. academic programs in Cuba unconstitutionally violate their rights to academic freedom under

the First Amendment and the Fifth Amendment's "substantive due process clause" [*sic*] and their rights to travel internationally for First Amendment purposes under the Fifth Amendment. Appellants claimed, moreover, that the amendments violate the Act and the APA.

The Government responded that each of the appellants lacks standing to bring the asserted challenges, arguing that appellants had not sustained an injury-in-fact of sufficient concreteness or imminence and that appellants had failed to demonstrate that a favorable decision would redress the alleged injury, because any such relief depends on the independent action of non-party universities. On the merits, the Government argued (*i*) that the 2004 amendments are a reasonable interpretation of the Act and moreover fall squarely within the Executive Branch's inherent foreign policy powers and (*ii*) that the amendments did not deprive appellants of any constitutional right.

The district court rejected the Government's standing challenge as to Smith and Wakefield as individuals, as well to the Coalition as an association. *Emergency Coalition to Defend Educational Travel v. Dep't of Treasury*, 498 F. Supp. 2d 150, 161 (D.D.C. 2007), but described the issue as "close." *Id*. at 158. Cotman was held to lack standing on the grounds that he had failed to demonstrate sufficiently concrete plans or opportunities for educational travel to Cuba. *Id*.[2]

---

[2] The district court further observed that the claims of appellants Jessica Kamen and Adnan Ahmad would be moot if, as anticipated, these two students in fact graduated from Johns Hopkins in 2007. The court declined to address this issue at length, however, given its conclusion that the two lacked standing on the basis that they lacked concrete travel plans. 498 F. Supp. 2d at 158 n.3.

The court also held that even assuming, *arguendo*, that appellants possess a right to academic freedom, no violation of any such right occurred as a result of the 2004 amendments, since the regulations in question are content-neutral and supported by an important and substantial governmental interest. *Id*. at 161. Appellants' Fifth Amendment arguments were rejected as "simply wrong." *Id*. at 163. Finally, the court held that both of appellants' statutory arguments–that the 2004 restrictions are not rationally related to the purposes of the Act and that the amendments contravene the will of Congress–lacked merit. *Id*. at 164.

This appeal followed.

II

The Government reiterates its contention that none of the appellants has standing and that we therefore lack jurisdiction over the case. Of course, if any one of appellants has standing, we have jurisdiction. The Government claims that Dr. Smith is the linchpin of the appellants' standing case: the standing of both the Coalition and Wakefield is dependent on him. We therefore address Smith's claim first.

Smith asserts that in each year from 1997 until the 2004 regulations were promulgated, he had taken fifteen to twenty students for three-week January study programs in Cuba. He also frequently took groups of six to eight students for a similar three-week course in June. Smith claims to have been injured by each of the three amendments at issue. The full-time faculty requirement most directly affects Smith, as he neither holds a full-time position at Johns Hopkins nor intends to do so in the future. The non-aggregation and minimum duration requirements allegedly injure Smith by drying up the funds

necessary to support the Cuba program at Johns Hopkins and by driving away the program's student clientele, respectively, thus denying Smith the opportunity to teach in Cuba. Despite the success of the Cuba courses to date at a university known for its study abroad offerings, the 2004 amendments are alleged to have forced Johns Hopkins to cancel the inter-session programs. Smith states that he and Professor Eduardo González had already made concrete plans for the January 2005 course and were intent upon continuing the program into the indefinite future. He further indicates that the two professors "doubtless" would have "accompanied the group to Havana and shared in teaching the course." The district court thought that appellants had "the better argument [in] that their concrete and definite statements of future plans elevate their claims beyond the realm of hypothetical intentions and suffice to support a finding of injury-in-fact." 498 F. Supp. 2d at 158.

We agree. Although the Supreme Court has said that "'some day' intentions–without any description of concrete plans, or indeed even any specification of *when* the some day will be–do not support a finding of the 'actual or imminent' injury that our cases require," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original), the consistent annual repetition of the January program over several years culminating in concrete plans for the content and focus of the 2005 program are plainly far more concrete and specific than mere "some day" intentions.

Notwithstanding, the Government insists Smith cannot establish injury-in-fact because it reads the pre-amendment regulations as barring part-time faculty from teaching in Cuba. Thus, according to the Government, even were the 2004 amendments to be rescinded, he would be ineligible to teach in Cuba. The prior regulations were, however, ambiguous:

> The organization of and preparation for transactions and activities described in paragraphs (a)(2)(i) through (a)(2)(vi) of this section by a *full-time employee* of a U.S. academic institution. An individual engaging in such transactions must carry a written letter from the individual's U.S. academic institution, citing the number of that institution's specific license and stating that the individual is *regularly employed* there.[3]

It is not clear whether this provision meant that those who "organize and prepare" teaching activities include the faculty who do the teaching. It is evident that the Office must have thought the prior regulations did not clearly reach someone like Smith, for otherwise the relevant amendment would not have been introduced. In any event, the Government is mixing a merits question into the standing analysis, which is improper. In considering standing, we must assume the merits in favor of the party invoking our jurisdiction. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd on other grounds sub nom. District of Columbia v. Heller*, 128 S. Ct. 2783 (2008); *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *Am. Fed'n of Gov't Employees, AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982). Therefore, we must assume that the 2004 amendments have the legal significance appellants assert. Moreover, as the Coalition observes, even if the Government were correct, Smith would still satisfy the injury-in-fact element because he would then be asserting that the pre-2004 regulations–as newly applied–had caused his injury.

---

[3] *Id.* at 515.565(a)(2)(vii) (2003) (emphasis added).

Alternatively, the Government challenges redressability, arguing that even if the 2004 amendments were voided, it is unlikely that Johns Hopkins would resume the program. It is clear that the program was discontinued because of the 2004 amendments. Indeed, the Government has conceded causation.[4] Yet the Government insists that Smith has provided insufficient indication that the program would be revived by Johns Hopkins were we to grant relief. To be sure, Johns Hopkins is not a party–a point emphasized by the Government–and no unequivocal statement from the university has been produced indicating an intent to resume the program if appellants prevail. We do, however, have a letter from the Provost and Senior Vice President for Academic Affairs at Johns Hopkins requesting reconsideration of the regulations so that the university may "continue offering" the program. And Smith has evidently continued as Director of the Cuba program during the four years that it has remained inactive, which is indicative of the university's desire to continue the program.

Normally, causation and redressability are overlapping inquiries in standing cases: there is generally no real analytic difference between the two concepts. Here, however, they do not quite overlap; although causation is obvious and conceded, if there were an indication that Johns Hopkins' view had altered, redressability would be doubtful. But the Provost's letter, which establishes causation, and Smith's present title strongly suggest a continuing intention on the part of Johns Hopkins to resume the program once the regulatory obstacles are removed. In fact, we think it is not merely more probable than not that Johns Hopkins would do so, it is extremely likely that the university

---

[4] *Emergency Coalition to Defend Educational Travel*, 498 F. Supp. 2d at 156.

would resume the program. We can imagine no reason, given the record before us, why the university would choose not to do so.

To be sure, the Government asserts in a bootstrap argument that once Johns Hopkins learns, as it has through this litigation, that the government *now* believes that the pre-2004 regulation prevented Smith from participation in the program, it will likely acknowledge the Government's authority and refrain from employing Smith in his prior capacity as program director. However, if we were to conclude that the 2004 amendments did in fact make the change asserted by appellants and were also unconstitutional, perforce we would conclude the pre-2004 amendments were no bar. Or, if we were alternatively to agree with appellants' argument that if the pre-2004 amendments were the bar, they were unconstitutional, it could not be expected that Johns Hopkins would be deterred by a rejected government legal position.

This case, then, is quite distinguishable from our recent decisions in *National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004), and *Renal Physicians Association v. HHS*, 489 F.3d 1267 (D.C. Cir. 2007). In *Wrestling Coaches*, there was reason to believe that universities might well independently implement the Title IX policy of equalizing male and female athletic resources by eliminating or restricting wrestling teams of their own accord, even if the court held that the government regulations at issue were illegal. Similarly in *Renal Physicians*, the disputed government regulations, which set forth a voluntary "safe harbor" method for calculating statutorily-required fair market value for payments to physicians from clinical laboratories, would not control the laboratories' conclusions as to what was fair market value even if declared *ultra vires*. And the

laboratories might well voluntarily adopt the safe harbor method, which the government had concluded to be a reflection of fair value.

Finally, in a last gasp, the Government essentially argues that appellants lack prudential standing, because, insofar as academic freedom is a constitutional component of the First Amendment, it is a right pertaining to *universities* and *not* to individual professors. To be sure, when considering prudential standing under the APA, we do peek at the merits, at least insofar as is necessary to determine whether the petitioner has an arguable claim that falls within the zone-of-interests protected or regulated by the substantive statute. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106-07 (D.C. Cir. 2008). Under a similar analysis, even assuming that academic freedom is a constitutionally-protected right held by universities alone, Smith would still be within the zone-of-interests of that constitutional protection for standing purposes.

In sum, we agree with the district court that Smith has standing, and we need go no further to satisfy our jurisdiction.[5]

---

[5] We note that even were we to agree with the Government's arguments as to injury-in-fact or redressability in regards to Smith, Wakefield might still have standing to bring her claim. Nothing in the record indicates that Johns Hopkins or its Cuba Exchange Program would revoke Wakefield's acceptance to the program or that such acceptance was uniquely contingent upon Smith's retaining his position as Director. Indeed, the opposite is likely to be true.

14

III

Appellants assert that the regulations violate their individual First Amendment rights to "academic freedom" by restricting who may teach and what may be taught in American universities. Appellants concede–as they must–that the federal government may, under certain circumstances, regulate Cuban study programs. Nevertheless, they argue that the Supreme Court case that recognized this government authority, *Regan v. Wald*, 468 U.S. 222, 242 (1984), required a showing of "weighty"–which term appellants understand to mean "compelling"–considerations of national security.

The Government responds that even if there is a component of the First Amendment that protects academic freedom–separate and apart from the Amendment's coverage of free speech–it is a right that inheres in universities, not individual professors. Again, it is emphasized that no university has joined this action. Be that as it may, the Government claims that if any institution or person holds such a right, it is not transgressed by regulations that are content-neutral and supported by an important governmental interest.

Any substantive governmental restriction on Smith's academic lectures would obviously violate the First Amendment. Assuming that the right to academic freedom exists and that it can be asserted by an individual professor, its contours in this case are certainly similar to those of the right of free speech. Namely, the right can be invoked only to prevent a governmental effort to regulate the *content* of a professor's academic speech. *See Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 197 (1990). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). This inquiry into content-neutrality centers on the purpose of the government regulation, that is, "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id*. Where a regulation is held to be content-neutral, we apply the so-called "intermediate scrutiny" test set forth by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968). "[W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id*. at 377. In sum, "content-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further 'an important or substantial government interest.'" *Walsh v. Brady*, 927 F.2d 1229, 1235 (D.C. Cir. 1991).

The Office's Director has stated that the purpose of the Cuban embargo, and therefore also of the Office's regulations, is to deny currency to the government of Cuba. Our government has long deemed this policy instrumental to the ultimate goal of nudging Cuba toward a peaceful transition from the oppressive policies of the Castro regime to a free and democratic society. The 2004 amendments were specifically designed to curtail tourism, a critical and much-exploited revenue source for the Cuban government. The purpose of the 2004 amendments, thus, is content-neutral. *See Capital Cities/ABC, Inc. v. Brady*, 740 F. Supp. 1007, 1013-14 (S.D.N.Y. 1990). None of this is remotely related to the suppression of free expression, nor is any restriction whatsoever placed on the subject matter or editorial

slant a professor may choose to incorporate into his teaching on Cuba.

Appellants attempt to show that the 2004 amendments eliminate academic content that is exclusively available *in situ* in Cuba, for example, field trips and cultural excursions. We think this notion of "content" stretches the term beyond all recognition. Professors and students of the law may arguably benefit academically from visiting a maximum-security penitentiary or witnessing an execution; that regulations and prison codes may restrict free access to our penal institutions does not, in our view, render them content-based regulations. Contrary to appellants' implication, there is not the slightest showing that the Government sought to suppress the message that Cuba "warrant[s] study." Indeed, even under the new regulations, professors remain free to teach in Cuba so long as they and their institutional employers establish programs in accordance with the regulations. Nothing–at least nothing under *American* law–prevents or ever has prevented Professor Smith from lecturing on his favored topics. *See*, *e.g*., Wayne S. Smith, "A Trap in Angola," *Foreign Policy*, No. 62 (Spring, 1986), 61-74; Wayne S. Smith, "Lies About Nicaragua," *Foreign Policy*, No. 67 (Summer, 1987), 87-103; Wayne S. Smith, ed., *The Russians Aren't Coming: New Soviet Policy in Latin America* (1992).

Appellants contend that we are bound by precedent to apply a particularly exacting form of strict scrutiny to the 2004 amendments. They would require a specific demonstration that the amendments are *justified* by national security concerns. We agree with the district court that strict scrutiny is inappropriate. As noted *supra*, the *O'Brien* intermediate scrutiny test applies to content-neutral regulations, and so long as the federal government's interest in promulgating the regulations at

issue–here, the denial of currency to the Castro regime–is deemed "important" or "substantial," the regulations must be upheld.

The Supreme Court has stated that the denial of hard currency to Cuba is "justified by weighty concerns of foreign policy." *Regan*, 468 U.S. at 242. In *Walsh*, a case involving a First Amendment challenge to the application of the Cuba travel restrictions to the news-gathering activities of an importer of political posters, we held that denial of hard currency to Cuba meets the intermediate scrutiny standard. 927 F.2d at 1235. Our sister circuits have uniformly reached similar conclusions. Denial of hard currency to hostile regimes, including Cuba, has been described as "vital," *Teague v. Regional Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968), and as "compelling," *Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs*, 459 F.2d 676, 682 (3d Cir. 1972). Further, on numerous occasions, content-neutral restrictions on travel to Cuba and other hostile nations have been upheld in the face of similar First Amendment challenges. *See*, *e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) (passport validation); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996) (educational travel); *Clancy v. OFAC*, No. 05-C-580, 2007 U.S. Dist. LEXIS 29232, 2007 WL 1051767, at *16 (E.D. Wis. March 31, 2007) (travel to Iraq as "human shield").

Even weaker is appellants' claim that their right to travel under the Fifth Amendment has been infringed by the regulations. Although *Kent v. Dulles*, 357 U.S. 116, 127 (1958), did recognize the right to international travel as part of a liberty interest, subsequent cases have distinguished the right to travel within the United States–which carries greater protection–from international travel. *See, e.g., Haig v. Agee*, 453 U.S. 280, 306 (1981). In *Regan*, the Court disapproved of *Kent*'s broad

protection of international travel and upheld the very same regulations at issue here in a prior form.  468 U.S. at 241 n.25. The Court emphasized that the plaintiffs there, unlike in *Kent*, were not denied passports to travel to Cuba on the basis of personal characteristics.  (Kent was a member of the Communist Party.)  Instead, the regulations applied equally to all citizens and were rooted in foreign policy concerns.  *Id*. at 241. Appellants insist that *Regan* limited the government's ability to enact travel restrictions to those situations in which it can point to "weighty" (that is, on appellants' view, "compelling") considerations of national security.  To be sure, as we noted, the *Regan* Court did describe the government's considerations as "weighty," but there is not the slightest suggestion in the opinion that the Court was arrogating to the federal judiciary the authority to make determinations as to the importance of competing foreign policy options.  Indeed, the Court made clear that the federal judiciary was obliged to defer to the political branches on such questions.  *Id*. at 242.

We therefore agree with the district court's dismissal of appellants' Fifth Amendment challenge.[6]

---

[6] Appellants also assert a bevy of statutory claims, although their briefs are rather imprecise.   Those issues (addressed by the district court) no longer appear to be the target of appellants' argument.  They concede that the precatory language of the Free Trade in Information Act upon which they rely was "of course . . . non-binding," but argue that the language remains relevant.  They urge us to hold that the "sense of Congress" language shows that the rulemaking was undertaken in "defiance" of the will of Congress.  The short answer to appellants' argument is that a sense of Congress resolution is not law.

Appellants also argue that the amendments were promulgated

The district court's grant of appellees' motions to dismiss with prejudice is affirmed.

*So ordered.*

without factual support and therefore violate the APA. We take it that they are challenging the supposed factual premises of the Commission Report, but these factual issues are intertwined with policy judgments that we have no basis to question.

EDWARDS, *Senior Circuit Judge, concurring*: The disputed regulations in this case, tightening restrictions on educational travel to Cuba, are content neutral and supported by an important governmental interest.  Therefore, I agree that the regulations do not infringe appellants' First Amendment rights.  Appellants have not invoked any right to "academic freedom" that trumps the government's right to promulgate the regulations.  We therefore assume that, in this case, the First Amendment rights implicated by appellants' claims are coterminous with any applicable rights to academic freedom.

The disposition of the First Amendment issue in this case on grounds other than academic freedom is relatively straightforward and uncomplicated.  Therefore, it is unnecessary for us to parse the many difficult issues relating to the concept and scope of "academic freedom," including, *inter alia*: whether academic freedom is a constitutional right at all; the breadth of academic freedom; whether academic freedom implicates additional constitutional interests that are not fully accounted for by the Supreme Court's customary employee-speech jurisprudence; whether a professor may assert an individual constitutional right of academic freedom against a university employer; how academic freedom should be enforced in public versus private universities; whether and how we distinguish between the university-as-a-speaker and the university-as-an-employer in assessing the contours of academic freedom; and the extent to which professors have rights of academic freedom in university governance.  For an excellent discussion of the complex issues surrounding academic freedom, see Judith Areen, *Government* as *Educator: A New Understanding of First Amendment Protection of Academic Freedom and Governance*, 97 GEO. L.J. _____ (forthcoming Apr. 2009).

Academic freedom is not an easy concept to grasp, and its breadth is far from clear.  It has generally been understood to protect and foster the independent and uninhibited exchange of ideas among teachers and students and the serious pursuit of

scholarship among members of the academy. However, as Professor Areen notes in her article, academic freedom as a First Amendment concept may extend beyond writing and teaching and include concepts of "shared governance." The Supreme Court's decision in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 n.11 (1985) – noting that "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation" – gives some life to this idea. In upholding the faculty's decision to dismiss a student without permitting a reexamination, the *Ewing* Court said:

> Added to our concern for lack of standards is a reluctance to trench on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom, "a special concern of the First Amendment." *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967).[12] If a "federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies," *Bishop v. Wood*, 426 U.S. 341, 349 (1976), far less is it suited to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions – decisions that require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. [78, 89-90 (1978)].
>
> [12] Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, *see Keyishian v. Board of Regents*, 385 U.S., at 603; *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (opinion of Warren, C.J.), but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself, *see University*

> *of California Regents v. Bakke*, 438 U.S. 265, 312
> (1978) (opinion of Powell, J.); *Sweezy v. New
> Hampshire*, 354 U.S., at 263 (Frankfurter, J.,
> concurring in result). Discretion to determine, on
> academic grounds, who may be admitted to study, has
> been described as one of "the four essential freedoms"
> of a university. *University of California Regents v.
> Bakke*, 438 U.S., at 312 (opinion of Powell, J.)
> (quoting *Sweezy v. New Hampshire*, *supra*, at 263
> (Frankfurter, J., concurring in result)) (internal
> quotations omitted).

474 U.S. at 226 & n.12.

In other words, the "four essential freedoms" of a university – first enunciated by Justice Frankfurter in *Sweezy* and cited favorably by the Court in a number of decisions since – have loosely come to include notions of shared governance. In *Grutter v. Bollinger*, 539 U.S. 306 (2003), Justice O'Connor, like Justice Stevens in *Ewing*, pointed to the role of the faculty in shared governance. *See id.* at 314-15, 328-29; *see also NLRB v. Yeshiva Univ.*, 444 U.S. 672, 688-90 (1980) (discussing the value of giving faculty members the principal responsibility for academic matters). *But see Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 287-88 (1984) (holding that faculty members do not have a constitutional right to participate in academic governance at public colleges and universities); *Univ. of Pa. v. EEOC*, 493 U.S. 182, 198-99 (1990) (distinguishing between direct and indirect infringements of academic freedom).

In discussing the current state of the law on academic freedom, Professor Areen notes the evolution of the case law addressing shared governance:

> The Court in its later decisions [has] embraced [Justice]
> Frankfurter's position in his *Sweezy* concurrence and
> extended constitutional protection to a number of academic

governance matters including admissions policy (*Bakke* and *Grutter*), student academic standards (*Ewing*), and the tenure process (*University of Pennsylvania v. EEOC*).

\* \* \* \*

The constitutional standard, unlike the professional standard, applies only to public colleges and universities. Faculty at public institutions may not have a constitutional right to participate in academic governance but their speech on academic matters such as student academic standards has been granted constitutional protection by the Supreme Court. Lower federal courts have extended constitutional protection to an even broader range of academic governance speech including criticism of a department's unsound teaching and administrative practices, discussion of admissions policy and size of the student body, and criticism of the administration at a meeting of the faculty senate. [Citations omitted.]

The protection granted to faculty governance speech has been limited, however, by the increasing application by courts of [the] public-employee speech doctrine to faculty claims. Both the *Pickering* balancing test and the *Connick* public concern test in particular have been used to deny constitutional protection to faculty governance speech. [*Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).]

The Supreme Court's latest words on academic freedom appear in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In that case, a deputy district attorney filed a 42 U.S.C. § 1983 complaint against officials in a district attorney's office, alleging that he was subject to adverse employment actions in retaliation for engaging in protected speech, that is, for writing a memorandum in which he recommended dismissal of a case on the basis of purported governmental misconduct. The Court

held that when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. The Court concluded that the deputy district attorney did not speak as a citizen when he wrote his memorandum and, thus, his speech was not protected by the First Amendment. *Garcetti*, 547 U.S. at 421-22.

In a dissent joined by Justice Stevens and Justice Ginsburg, Justice Souter raised the specter of academic freedom in expressing concern about the potential reach of the majority opinion in *Garcetti*:

Consider the breadth of the [majority's formulation of the public-employee speech doctrine]:

"Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." [Maj. op., 547 U.S. at 421-22.]

This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor, and I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write "pursuant to . . . official duties." *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional

tradition"); *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools'" (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960))); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (a governmental enquiry into the contents of a scholar's lectures at a state university "unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression – areas in which government should be extremely reticent to tread").

*Garcetti*, 547 U.S. at 438-39 (Souter, J., dissenting).

The majority opinion in *Garcetti* responds directly to the possible "important ramifications for academic freedom," *id.* at 425, raised by the dissenting Justices:

> Justice Souter suggests today's decision may have important ramifications for academic freedom, at least as a constitutional value. There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence. We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.

*Id.*

The Court in *Garcetti* neither refutes the existence of academic freedom as a part of the First Amendment, nor rejects

the suggestion that academic freedom may extend beyond the Court's "customary employee-speech jurisprudence." Rather, the Court simply leaves undecided the many questions relating to the concept and breadth of academic freedom. Prudence commands that we do the same, for the dispute in this case does not raise any serious questions about the contours of academic freedom.

SILBERMAN, *Senior Circuit Judge*, concurring: The very notion of academic freedom–as a concept distinct from the actual textual provisions of the First Amendment–is elusive. To be sure, Supreme Court cases have on occasion referred to academic freedom. *See Sweezy v. New Hampshire*, 354 U.S. 234 (1957); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182 (1990). In *Sweezy*, a plurality of the Court said that a state investigation directed against a professor who refused to answer questions concerning his allegedly subversive lectures and political associations had violated due process, because the Attorney General of New Hampshire had lacked the necessary statutory authority to pursue his investigation of Sweezy. 345 U.S. at 254-55. The Court also stated that there "unquestionably [had been] an invasion of [Sweezy's] liberties in the areas of academic freedom and political expression." *Id*. at 250. Yet it is unclear what of substance, if anything, the phrase "academic freedom" added to Sweezy's protections under the First Amendment.[1] And it is doubtful that a professor could assert an

---

[1] Even Justice Frankfurter, who explicitly relied on academic freedom principles in his concurrence, did not recognize an individual right of academic freedom. Rather, in Justice Frankfurter's view, the right of "academic freedom" belonged to the university: "When weighed against the grave harm resulting from intrusion into the intellectual life of a university, [the] justification for compelling a witness to discuss the contents of his lecture appears grossly inadequate." *Sweezy*, 354 U.S. at 261 (Frankfurter, J., concurring in result). I agree with the Fourth Circuit's analysis: "In light of . . . the actual holding and rationale in *Sweezy*, it is difficult to understand how that case can be viewed as clearly 'adopting' any academic freedom right, much less a right of the type claimed by [appellants]. At best, it can be said that six justices agreed that the First Amendment protects values of academic freedom. However, the justices were plainly of very different minds as to the nature of this 'right.'" *Urofsky v. Gilmore*, 216 F.3d 401, 413 (4th Cir. 2000) (en banc) (upholding state law that restricted state employees, including professors at public universities, from accessing certain sexually explicit material on

individual constitutional right of academic freedom against his university employer, whether state or private. For that matter, it is also doubtful that a state legislature lacks authority to oversee the content of a state university's offerings.

Indeed, in *Sweezy*, the Court noted that the Supreme Court of New Hampshire had "carefully excluded" the possibility that the investigation had been based on the state's interest in the state university, *id*. at 249, thereby implying that a state interest in the content of Sweezy's lectures might stand on different footing. This same concern was raised by the Supreme Court in *University of Pennsylvania*, in which the Court distinguished between government attempts to direct the content of teaching at a private university, where the state acts only as a regulator, and similar efforts directed at state schools, where the state acts as a "speaker" through its faculty employees. 493 U.S. at 198 n.6.

In *Keyishian*, another Cold War era case, the Court held that the First Amendment rights of employees of the State University of New York were violated when it was demanded that the employees certify, pursuant to a state statute, that they were not Communists. The Court stated that "our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is, therefore, a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U.S. at 603. But the Court based its holding on the fact that the statute used the terms "treasonable" and "seditious" in a manner that the Court found to be unconstitutionally vague. *Id*. at 604. While *Keyishian* comes closer than *Sweezy* to articulating a separate right of "academic freedom," the case nevertheless was decided on

computers owned or leased by the state).

grounds that might very well appear in any standard First Amendment challenge, even absent the academic context. The Court's holding, which did not focus on the actual content of the appellant professors' lectures but rather on their speech and associations as private individuals, could as well be applied to any state employee–not just professors. *See Urofsky*, 216 F.3d at 414.

As the Court implied in *University of Pennsylvania*, a state university may well have a right–perhaps even an obligation–to regulate the substance of professors' classroom lectures. 493 U.S. at 198 n.6. For example, were a professor of history to adopt in his lectures bizarre theories of Holocaust denial or a professor of sociology to claim the inferiority of certain races or ethnic groups, surely a university would not be powerless to prevent such pedagogical perversions. After all, the state can be said to "speak" through its employees.[2] This certainly suggests that the Government may well be correct in asserting that academic freedom–if indeed it is a First Amendment concept warranting separate protection–inheres in the university, not in individual professors. It is, furthermore, difficult to see why, if the university has a right to control at least the outer limits of its professors' lectures, a state legislature may not assert the same degree of control. I therefore share the doubts of our Fourth Circuit colleagues as to the notion that "academic freedom" is a constitutional right at all and that, should it exist, it inheres in

_____

[2] Since the only professor with standing is Smith (an employee of a private university), the government is clearly not acting as a speaker, only as a regulator. Under these circumstances, it is particularly difficult to perceive any distinction between the concept of academic freedom and free speech. Any substantive governmental restriction on Smith's academic lectures would obviously violate the First Amendment. (The Coalition, which includes public university professors, cannot have broader standing than Smith.)

individual professors. *Urofsky*, 216 F.3d at 410. (I note that the dissent in *Urofsky* never mentions academic freedom.) And I further join *Urofsky* in noting that the Supreme Court has never once invalidated a state regulation on the grounds that it violated a right to academic freedom. *Id*. at 412.

Some have thought that academic freedom would add to the First Amendment protection for academic governance. *See, e.g., Garcetti v. Ceballos*, 547 U.S. 410, 436-37, 438-439 (2006) (Souter, J., dissenting); *see also* Judge Edwards' concurrence. But recently, the Supreme Court rather dismissively referred to that notion, stating that there is "some argument" to support it. *Id*. at 425. And in *University of Pennsylvania*, the Court treated that concept as a ground for deference akin to *Chevron* rather than as a constitutional right. 493 U.S. at 199. With great respect for my colleague, Judge Edwards (and Professor Judith Areen), I do not perceive any principled reason why the First Amendment should be thought to protect internal governance of certain academic institutions (are "think tanks" included?) but not other eleemosynary bodies or, for that matter, trade unions or corporations.